UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT EARL HOWARD, DAMON
PETERSON, CARL TRACY BROWN, and
WILLIE WATTS on behalf of themselves and
all others similarly situated,

Plaintiffs,                                              Case No. 6:21-cv-62

_____

       vs.                                              **DECLARATORY AND
INJUNCTIVE RELIEF
SOUGHT**

MELINDA N. COONROD, Chairperson and
Commissioner, Florida Commission on Offender
Review, in her Official Capacity, RICHARD D.
DAVISON,  Vice Chairperson and Commissioner,
Florida Commission on Offender Review, in his
Official Capacity, and DAVID A. WYANT,
Secretary and Commissioner, Florida Commission
on Offender Review, in his Official Capacity,

      Defendants.

_____

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs ROBERT EARL HOWARD, DAMON PETERSON, CARL TRACY

BROWN, and WILLIE WATTS ("Named Plaintiffs" or "Plaintiffs") on behalf of

themselves and a class of those similarly situated, by and through their attorneys, allege

the following:

**INTRODUCTION**

1.      This class action for declaratory and injunctive relief is brought by the

Named Plaintiffs on behalf of themselves and, as of the date of this Complaint, over 100

individuals incarcerated in the state of Florida who were sentenced to life in prison *with* the possibility of parole for crimes they committed when they were children under the age of 18 ("Class Members"), but who are destined to die in prison because of the unconstitutional parole rules, policies and practices described herein. Because Florida has sentenced more children as adults than any other state in the country, Florida has one of the largest populations of individuals who are serving life sentences for crimes they committed when they were children ("juvenile lifers").

2.    Despite being sentenced to life *with* parole ("LWP") decades ago, the Named Plaintiffs and Class Members remain in prison today, with bleak prospects for release under a Florida parole system that has routinely flouted the mandates of recent United States Supreme Court rulings that bar death in prison for any youth who has not been found to be permanently incorrigible and incapable of rehabilitation.

3.    Specifically, in a series of landmark cases applying the cruel and unusual punishments clause of the Eighth Amendment, the U.S. Supreme Court has held that the developmental differences between children and adults are not only relevant in determining the constitutionality of certain criminal sentencing practices as applied to children, but that because of those differences, juvenile offenders – even those convicted of murder –  may not be condemned to spend their entire lives in prison except in the rare instance where the sentencer determines that a particular child "exhibits such irretrievable depravity that rehabilitation is impossible." *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) (*quoting Miller v. Alabama*, 567 U.S. 460, 479-80 (2012)); *Graham v. Florida*, 560 U.S. 48, 72 (2010). The Supreme Court has also held that this new substantive constitutional

rule is retroactive.  *Montgomery*, 136 S. Ct. at 734.

4.     Taken together, these decisions establish that the Eighth Amendment to the U.S. Constitution requires that states affirmatively provide juvenile lifers with a "meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation."  *Graham,* 560 U.S. at 75.

5.     While these landmark U.S. Supreme Court cases involved juveniles sentenced to life *without* parole ("LWOP"), many courts have held that the underlying principles apply equally to those juvenile lifers sentenced to life *with* parole where it is shown that parole policies, procedures, and practices fail to afford these individuals a realistic opportunity for release or a meaningful opportunity to demonstrate their maturity and rehabilitation.   *See State v. Patrick*, Slip Opinion No. 2020-Ohio-6803 (Dec. 22, 2020); *Brown v. Precythe*, 2019 WL 3752973, *7 (W.D. Mo Aug. 8, 2019); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015) *appeal dismissed sub nom. Hayden v. Butler*, 2016 WL 4073275 (4th Cir. Aug. 1, 2016); *Wershe v. Combs*, 763 F.3d 500, 505-06 (6th Cir. 2014); *Maryland Restorative Justice Initiative v. Hogan*, 2017 WL 467731 (D. Md. Feb. 3, 2017).

6.     In 2014, in response to the Supreme Court's decisions in *Miller* and *Graham,* Florida adopted new sentencing procedures for juvenile offenders serving – or facing – life in prison. *See* Chapter 2014–220, Laws of Florida ("2014 Juvenile Sentencing Statute").  The 2014 Juvenile Sentencing Statute requires that the trial court hold an individualized sentencing hearing to consider not only the offense committed but also the defendant's youth before imposing a life sentence.  Fla. Stat. § 921.1401.  It also provides

for a subsequent review of the sentence after 15 or 25 years depending on the severity and the circumstances of the offense, at which point the judge is specifically required to consider the defendant's maturation and rehabilitation to determine whether the sentence should be modified. Fla. Stat. § 921.1402. The juvenile offender is entitled to be represented by counsel, attend the sentencing and resentencing, hire experts, present evidence, cross-examine witnesses, and appeal the court's decision. The Florida Supreme Court has held that the 2014 Juvenile Sentencing Statute must be applied retroactively. *Falcon v. State,* 162 So. 3d 954 (Fla. 2015).

7.      Florida does not, however, treat all juvenile lifers the same. While those receiving the harsher sentence of life *without* parole ("LWOP") receive the constitutionally required *meaningful opportunity for review* provided by the 2014 Juvenile Sentencing Statute, the statute is silent on whether it applies to juveniles sentenced to life *with* parole, and the State has refused to provide the substantive and procedural benefits of the 2014 law to the Named Plaintiffs and Class Members.

8.      Instead, juvenile lifers sentenced to LWP may only be released from prison in accordance with the limited process set forth in Florida's parole statutes. That process, which is virtually identical for adult and juvenile offenders, is administered by the Florida Commission on Offender Review ("FCOR" or "Commission"). Unlike the 2014 Juvenile Sentencing Statute, which requires consideration of the individual's maturity and rehabilitation, the criteria for release under the parole statutes are "designed to give primary weight to the seriousness of the offender's present criminal offense and the offender's past criminal record." Fla. Stat. § 947.002(2). Moreover, the parole statute specifically states

that "[i]t is the intent of the Legislature that the decision to parole an inmate from the incarceration portion of the inmate's sentence is an *act of grace* of the state and *shall not be considered a right*." *Id*. at § 947.002(5) (emphasis added). Florida's parole system therefore directly contradicts the mandates of the U.S. Supreme Court cases that establish that juvenile lifers have a constitutional right to be released from prison upon demonstration of maturity and rehabilitation. That right is not dependent on an "act of grace" by the State.

9.    The policies, procedures, and practices of the Commission do not give juvenile lifers serving LWP sentences a meaningful opportunity to prove their maturity and rehabilitation. Unlike individuals serving LWOP sentences who are now entitled to resentencing and sentencing reviews before a judge, juvenile offenders serving LWP are prohibited from attending meetings where the Commission determines if and when they may be released. The Parole Commissioners never speak to or even see them. Prosecutors and victim's families, however, are permitted to attend Commission meetings and address the Commissioners. Juvenile lifers have no opportunity to correct any factual inaccuracies presented to the Commission. Juvenile lifers are not entitled to counsel nor are they given the right to have experts make mental health and risk assessments and testify as to their rehabilitation.

10.    The Commission routinely hears over 40 cases each day and allots an average of ten minutes to each one. In the vast majority of cases, the Commission rejects the recommendation of its own investigators – the only ones who actually meet with the juvenile lifer and prison officials. Instead, the Commission in most cases actually *increases*

the time which the juvenile lifer will serve.  Focused on the facts of the original offense, the Commission rarely considers whether the individual has in the intervening decades demonstrated maturity and rehabilitation and is reasonably fit to reenter society.  The Commission's actions are recorded on a 1-2 page preprinted form with no meaningful description of the basis for the Commission's decision and no discussion of what a juvenile lifer needs to do to earn parole going forward.

11.    There is no justification for the stark difference in treatment between juvenile offenders who received LWOP sentences and those who received LWP sentences.  There is generally no significant difference in the crimes committed.  Both groups committed capital offenses punishable by life imprisonment.  The main difference turns on *when* the crime was committed – before or after parole was abolished in Florida for these offenses on May 25, 1994.  Juveniles convicted of a capital homicide committed before May 25, 1994 are serving LWP sentences and may only be released by the "grace" of the Commission.  Juveniles convicted of a capital homicide after that date received LWOP sentences and are now entitled to extensive judicial review of their sentences and a panoply of due process rights.    There is no substantive reason to treat the two groups differently, but the juvenile lifers serving LWP are not being afforded the right to meaningful opportunity for release now required by the Constitution.

12.    The stark and unfair differences in treatment are not limited to those between individuals serving LWP and those serving LWOP.  Due to contrary rulings just two years apart by the Florida Supreme Court, the same disparate treatment also exists among those who received identical sentences of LWP, some of whom received a judicial

resentencing under the 2014 Juvenile Sentencing Statute while others were denied that opportunity and relegated to the parole system.  As set forth in detail below, this disparity arose when Florida's Supreme Court first extended the benefits of the 2014 Juvenile Sentencing Statute to juveniles serving LWP but then subsequently reversed itself and withdrew them two years later. Again, the difference in treatment turns on the calendar, not the offense or the offender.

13.     A recent study by Florida International University College of Law (the "FIU Study") documented the disparate treatment between those juveniles serving LWP for homicide who received the benefits of a judicial proceeding pursuant to the 2014 Juvenile Sentencing Statute compared to those who were relegated to the parole system after the Florida Supreme Court reversed course. The FIU Study showed that **70% of the juvenile lifers (63 of 90) who were resentenced by a judge were ultimately released from prison**. FIU Study, Exhibit A at 7 ("Analysis of Florida Commission on Offender Review Juvenile Parole Eligible Inmate Files:  Does Florida's Parole System Provide a Meaningful Opportunity for Release?", FIU Project, 2d ed. Sept. 2020"). By comparison, **for those juvenile lifers dependent on the parole process, only five (out of over 100) have been released from prison since 2016**, at least three of whom had the benefit of counsel. *Id.* Rather than imprison for life only the rare juvenile offender who is irreparably corrupt, the Commission does the opposite.  It incarcerates for life almost all juvenile offenders convicted of capital offenses.

14.     The FIU Study also found that, on average, individuals in the sample were 51 years old when they were released by the courts following resentencing or judicial

review. *Id.* at 29. However, for those relegated to the parole system, they can expect to serve another 44 years beyond that and will, on average, be 95 years of age – well beyond their life expectancy – at their most recently established Presumptive Parole Release Date ("PPRD"). *Id.* at 30.

15.    The Named Plaintiffs and Class Members have not been afforded the resentencing hearings set forth in the 2014 Juvenile Sentencing Statute. Thus there has been no judicial determination that any one of them is the rare juvenile offenders whose crime reflects irreparable corruption for whom a life sentence may be appropriate. Therefore, they must be provided a meaningful opportunity to demonstrate their maturity and rehabilitation, and must be given a realistic opportunity for release.

16.    The disparities created by Florida's dual-track system for juvenile lifers cannot stand.  By affording juveniles sentenced to life without parole a re-sentencing hearing before a judge that meets the mandates of the U.S. Supreme Court, but leaving the release fate of hundreds of other individuals sentenced to life with parole in the hands of a parole process operating entirely outside the bounds of these constitutional requirements, Defendants have violated, and continue to violate, Plaintiffs' rights to equal protection and due process under the Fourteenth Amendment; their right to be free from cruel and unusual punishments under the Eighth Amendment; and their right to a judicial resentencing under the Sixth Amendment.

17.    Accordingly, Plaintiffs seek declaratory and injunctive relief: (1) finding that Florida's sentencing and parole review statutes, and Defendants' procedures, policies, customs, and practices are unconstitutional as drafted and as applied to juveniles sentenced

to life with the possibility of parole; and (2) requiring Florida to provide Plaintiffs and Class Members a judicial resentencing in accordance with the current resentencing framework set forth in the 2014 Juvenile Sentencing Statute, or requiring Defendants to afford Plaintiffs, and those similarly situated, a meaningful opportunity to obtain release based on non-arbitrary criteria and with essential procedural protections that measure their degree of maturity and rehabilitation in accordance with U.S. Supreme Court mandates.

## JURISDICTION AND VENUE

18.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States; and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

20.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## PARTIES

21.    Plaintiff Robert Earl Howard is a youthful offender, now 56 years of age, who is incarcerated at South Bay Correctional and Rehabilitation Facility in Palm Beach County, Florida. He was sentenced to LWP in 1982 for first-degree murder and burglary with an assault therein.  He has been incarcerated for 39 years and has been denied parole four times.  He has not received any disciplinary reports ("DR") in prison for the last 35 years.  He will be 91 years of age at his current presumptive parole release date ("PPRD")

in 2073.

22.    Plaintiff Damon Peterson is incarcerated at Tomoka Correctional Institute in Volusia County, Florida.  He is serving a LWP sentence for a felony murder committed when he was 16 years old.  He has been in custody for 27 years.  Mr. Peterson was interviewed by a parole examiner who recommended a presumptive parole release date of April 2027.  The Parole Commission, without seeing or interviewing Mr. Peterson, rejected that recommendation, added 33 years to the recommendation and set his PPRD date in 2060, when he will be 84 years of age.

23.    Plaintiff Carl Tracy Brown is a juvenile offender who committed his crimes at age 16.  He is currently serving an LWP sentence at Avon Park Correctional Institution in Highlands County, Florida.  He has been incarcerated for 32 years and has a PPRD of 2032, when he will be 60 years of age.  Mr. Brown has not had a single DR issued to him for his entire 32 years in prison.

24.    Plaintiff Willie Watts is incarcerated at Tomoka Correctional Institution in Volusia County, Florida for non-homicide crimes committed when he was 17.  He has been incarcerated for 40 years and his PPRD is set for 2064 when he will be 104 years old.  A judge has already determined that Mr. Watts has demonstrated sufficient rehabilitation and maturity to be released from prison next year, but the Commission takes the position it is not required to follow or honor that judicial finding.

25.    Plaintiffs bring this action individually and on behalf of a class consisting of all persons who: (i) were convicted of crimes committed when they were under the age of 18; (ii) were sentenced to life in prison or a term of years exceeding their life expectancy

(iii) are currently in the custody of the Florida Department of Corrections; and (iv) are or will become eligible for release to parole supervision.

26.      Plaintiffs have no adequate remedy at law.  Unless enjoined by this Court, Defendants will continue to violate Plaintiffs' constitutional rights.

27.      Defendant Melinda N. Coonrod is the Chairman of the Commission.  She is a former prosecutor. She is sued in her official capacity for the purpose of obtaining declaratory and injunctive relief.

28.      Defendant Richard D. Davison is the Vice Chair of FCOR.  He is a former prosecutor and former deputy Secretary of the Department of Corrections.  He is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

29.      Defendant David A. Wyant is the Secretary of FCOR and a former deputy police chief.  He is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

30.      Defendants Coonrod, Davison and Wyant, appointed by the Governor and Cabinet, are the three current members of the Commission.  The Commission is required to "develop and implement objective parole guidelines which shall be the criteria upon which parole decisions are made."  Fla. Stat. § 947.165 (1).  The Commission is required to develop the objective guidelines based on an acceptable research method and review them annually.  *Id.*  The Defendants have the authority to implement the declaratory and injunctive relief sought herein.

**FACTUAL ALLEGATIONS**

**U.S. Supreme Court Holds that Youth Matters for Purposes of Sentencing**

31.    Courts and legislatures have long recognized that children are psychologically and socially immature, are susceptible to persuasion and abuse, and are marked by judgmental inexperience such that it is appropriate to categorically limit their ability to vote, marry, serve on juries, drink alcohol, gamble, leave school and otherwise exercise full autonomy under the law.  *J.D.B. v. North Carolina*, 564 U.S. 261, 272-77 (2011).

32.    Over the last 15 years, the U.S. Supreme Court has issued a series of decisions holding that juvenile offenders are categorically and constitutionally different from adults for purposes of criminal sentencing and punishment.

33.    In the first of these decisions, *Roper v. Simmons*, decided in 2005, the Court held that the Eighth and Fourteenth Amendments to the U.S. Constitution forbid the imposition of the death penalty on people who were under 18 years old at the time of their offenses.  543 U.S. 551 (2005).

34.    In *Roper*, the Supreme Court relied on social science research, common sense, and international consensus to conclude that juveniles are "categorically less culpable than the average criminal."  *Id.* at 552 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)). The Court identified three characteristics that make juveniles less culpable and more capable of rehabilitation than adults: (1) immaturity and an underdeveloped sense of responsibility; (2) vulnerability to negative influences such as peer pressure; and (3) a character that is not well formed, with personality traits that are more likely to be transitory

than fixed.  *Id.* at 569-70.

35.    Five years later, the Supreme Court ruled in *Graham v. Florida* that the Eighth Amendment prohibits the imposition of a life sentence without parole ("LWOP") on juveniles who commit a non-homicide offense.  560 U.S. 48, 82 (2010).   At that time, the vast majority of youth sentenced to LWOP for non-homicide crimes had been sentenced in Florida.  Out of the 124 children sentenced to die in prison for non-homicide crimes, 77 of them were in Florida.  *Id.* at 48.

36.    The *Graham* Court reiterated the differences between juveniles and adults identified in *Roper*, pointing out that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," including "the parts of the brain involved in behavior control" and juveniles' greater "capacity for change."  *Id.* 68, 74.  These differences, the Court found, make children "less deserving of the most severe punishments."  *Id.* at 68.

37.    The *Graham* Court recognized that "life without parole is 'the second most severe penalty permitted by law,'" rendering a "forfeiture that is irrevocable" and "deprives the convict of the most basic liberties without giving hope of restoration."  *Id.* at 69-70 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 960 (1991)). The Court explained that the irrevocable forfeiture of liberty occasioned by an LWOP sentence is an "especially harsh punishment for a juvenile," who "will on average serve more years and a greater percentage of his life in prison than an adult offender," meaning that a "16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only."  *Id.* at 70.

38.     Thus, the Court concluded that states must give juvenile non-homicide offenders "***some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation***," an opportunity that an LWOP sentence categorically forecloses. *Id.* at 75 (emphasis added).

39.     In 2012, the Supreme Court built on the rationales set forth in *Roper* and *Graham*, holding in *Miller v. Alabama* that a mandatory LWOP sentence for persons under 18 at the time of their crimes—regardless of the nature of the crime (homicide or non-homicide)—constitutes cruel and unusual punishment under the Eighth Amendment. 567 U.S. 460, 489 (2012). The Court concluded that statutorily-mandated LWOP sentences, such as the one in Florida at the time, for juveniles who commit murder "pose[] too great a risk of disproportionate punishment" because of "the great difficulty" in distinguishing "the juvenile offender whose crime reflects unfortunate yet transient immaturity, ***and the rare juvenile offender whose crime reflects irreparable corruption***." *Id.* at 479-80 (emphasis added) (quoting *Roper*, 543 U.S. at 573).

40.     Accordingly, the Court held that before imposing an LWOP sentence on a juvenile offender, a court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a life in prison." *Id.* at 480. The Court added that, after considering how children are different, LWOP sentences for juveniles should be "uncommon" because of "children's diminished culpability and heightened capacity for change." *Id.* at 479.

41.     Lastly, in 2016, in *Montgomery v. Louisiana*, the Supreme Court held that *Miller*'s prohibition on mandatory LWOP for juveniles should be applied retroactively

because it established a new substantive constitutional rule.  136 S. Ct. 718, 736-37 (2016). The *Montgomery* Court explained that *Miller* created a substantive rule because it "determined that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crimes reflect irreparable corruption,'" making "life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* 734 (first quoting *Miller*, 567 U.S. at 479-80, then quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)).

42.    *Montgomery* acknowledged that *Miller* has a "procedural component," requiring a "hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at 735 (quoting *Miller*, 567 U.S. at 465).  The Court reasoned that this procedure "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735.

43.    The Court concluded by reiterating *Miller's* requirement that juveniles "must be given the opportunity to show that their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 736-37.

44.    In a final paragraph, the *Montgomery* Court suggested in dicta that "a State may remedy a *Miller* violation by extending parole eligibility to juvenile offenders." *Id.* at 736.  While the Supreme Court did not address how eligibility for parole could meet

*Miller's* mandate to provide a *meaningful opportunity* for release for juvenile lifers, a number of courts have upheld challenges to state parole systems that do not meet the constitutional requirements of *Miller*. *See State v. Patrick*, Slip Opinion No. 2020-Ohio-6803, at *12-13 (Dec. 22, 2020) (concluding that "the severity of a sentence of life in prison on a juvenile offender, even if parole eligibility is part of the life sentence, is analogous to a sentence of life in prison without the possibility of parole for the purposes of the Eighth Amendment"); *Brown v. Precythe*, 2019 WL 3752973, at *7 (W.D. Mo Aug. 8, 2019) (finding on summary judgment that defendants' policies, procedures, and customs for parole review for *Miller*-impacted individuals violate the constitutional requirement that those individuals be provided a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015) (finding that "[i]f a juvenile offender's life sentence, while ostensibly labeled as one 'with parole,' is the functional equivalent of a life sentence without parole, then the State has denied that offender the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' that the Eighth Amendment demands") *appeal dismissed sub nom. Hayden v. Butler*, 2016 WL 4073275 (4th Cir. Aug. 1, 2016); *Wershe v. Combs*, 763 F.3d 500, 505-06 (6th Cir. 2014) (reversing district court's opinion dismissing plaintiff's Eighth Amendment claim due to LWP sentence because district court failed to apply *Graham*); and *Maryland Restorative Justice Initiative v. Hogan*, 2017 WL 467731, at *27 (D. Md. Feb. 3, 2017) (finding Eighth Amendment claim sufficiently pled based on plaintiff's allegations that "Maryland's parole system operates as a system of executive clemency, in which opportunities for release are 'remote,' rather than a true

parole scheme in which opportunities for release are 'meaningful' and 'realistic,' as required by *Graham*").

45.    Together, *Roper*, *Graham, Miller*, and *Montgomery* reflect the U.S. Supreme Court's clear and unwavering view that juveniles' diminished culpability and greater capacity for rehabilitation are inconsistent with the law's most severe punishments. In particular, sentencing courts must consider how children are different before imposing a sentence that forecloses a meaningful opportunity for release from prison during their lifetime.  It ineluctably follows from this constitutional premise that a parole system must also treat juvenile offenders differently than adult offenders and provide them with a meaningful opportunity for release from prison.

46.    Florida's parole system, for the reasons documented in this Complaint, is not operating in a constitutional manner as to the Named Plaintiffs and Class Members.  It does not treat juvenile offenders differently from adult offenders.  It does not offer juvenile offenders the "meaningful opportunity" to demonstrate rehabilitation and maturity as required by the U. S. Supreme Court nor a realistic opportunity for release and a chance to live some of their lives outside prison walls.

<u>**History of Florida's Parole System**</u>

47.    In 1983, as part of a tough-on-crime trend, the State of Florida abolished parole for non-homicide offenses. Florida abolished parole for good in 1994 when it also eliminated it for homicide offenses.

48.    The abolition of parole was not retroactive.   Parole still applies to individuals who were sentenced before 1983 for non-homicide offenses and before 1994

for homicide offenses. This group of prisoners includes both juvenile and adult offenders. Plaintiffs and the Class Members therefore are those individuals who were sentenced to life with parole before 1983 (for non-homicide offenses) or 1994 (for homicide offenses). At a minimum, each Plaintiff and Class Member has been incarcerated for at least 26 years while some have been in prison for nearly 50 years.

49.     One of FCOR's many responsibilities is the administration and enforcement of this pre-existing parole system which will ultimately be non-existent once those serving sentences that were imposed before parole was abolished are either released or die in prison.

### History of Florida's Sentencing of Juveniles

50.     Florida has long been at the forefront of transferring large numbers of children from the juvenile system and charging them as adults in the state's criminal justice system. According to a 2013 Human Rights Watch report, Florida transferred more children out of the juvenile system into adult court than any other state in the country. *See Human Rights Watch, Branded for Life: Florida's Prosecution of Children as Adults under its "Direct File" Statute* (2013) (available at https://www.hrw.org/report/2014/04/10/branded-life/floridas-prosecution-children-adults-under-its-direct-file-statute).

51.     Since the establishment of its juvenile courts in 1951, Florida has required all children charged with a violation of Florida law punishable by death or life imprisonment to be charged and tried as adults once an indictment is returned. Fla. Stat. § 985.56 (2006); Fla. Stat. § 985.225 (1997); Fla. Stat. § 39.022 (1990); Fla. Stat. § 39.02(5)

18

(1951).

52.    Prior to the abolition of parole in Florida, there were two possible penalties for capital murder: the death penalty and life with the possibility of parole after no fewer than 25 years.  The Plaintiffs and the class they seek to represent were all sentenced under the sentencing statutes that were in existence prior to May 25, 1994 for capital offenses or prior to October 1, 1983 for non-homicide offenses.

53.    Upon information and belief, today there are more than 100 individuals who were under 18 at the time of their crimes and who remain incarcerated in Florida's prisons serving sentences of life with the possibility of parole, as they were sentenced either for non-capital crimes prior to 1983 or for capital felonies prior to 1994.

### Florida's Legislative Response to *Miller:* the 2014 Juvenile Sentencing Statute

54.    As previously discussed, in 2012 the Supreme Court held in *Miller v. Alabama* that a mandatory LWOP  sentence for persons under 18 at the time of their crimes—regardless of the nature of the crime (homicide or non-homicide)—constitutes cruel and unusual punishment under the Eighth Amendment.

55.    Because Florida had mandatory LWOP sentences, the *Miller* decision effectively "opened a breach in Florida's sentencing statutes" as they applied to juveniles convicted of capital murder.  *Hernandez v. State,* 117 So. 3d 778, 783 (Fla. 3d DCA 2013).

56.    In 2014, the Florida Legislature stepped into the breach by enacting juvenile sentencing legislation to remedy the federal constitutional infirmities in Florida's juvenile sentencing laws.  The legislative fix became Chapter 2014–220, Laws of Florida, and specifically sections one, two, and three of the legislation, which were codified in sections

775.082, 921.1401, and 921.1402 of the Florida Statutes, referred to herein as the 2014 Juvenile Sentencing Statute.

57.     Section One, Fla. Stat. § 775.082, provides new statutory penalties for juvenile offenders convicted of capital felonies with eligibility for judicial review for most offenders after 15, 20, or 25 years, depending on the severity and circumstances of the offense.

58.     In section Two of the 2014 Juvenile Sentencing Statute, codified at Fla. Stat. § 921.1401, the Florida Legislature set forth new procedures for the individualized sentencing hearing that is now required before a juvenile may be sentenced to life imprisonment.  Before imposing a life sentence, the sentencing court is required to consider not only the crime and its impact on the victim's family but also mitigating factors related to the defendant's age, background, family and community environment, peer pressure, the possibility of rehabilitation, and the effect of "immaturity, impetuosity, or failure to appreciate risks and consequences on the defendant's participation in the offense."  Fla. Stat. § 921.1401(2).

59.     In section Three of the 2014 Juvenile Sentencing Statute, codified at Fla Stat. § 921.1402, the Legislature provided guidelines for the subsequent mandatory judicial review of a juvenile offender's sentence and possible sentence modification if he or she is deemed reasonably fit to reenter society.  During this review, the statute requires the court to consider whether the juvenile lifer:

A.     demonstrates maturity and rehabilitation

B.     remains at the same level of risk to society

    C.      was a relatively minor participant in the criminal offense

    D.      has shown sincere remorse

    E.      was of an age, maturity and psychological development at the time of the offense that affected his or her behavior

    F.      has completed a GED or other technical, vocational or self-rehabilitation program

    G.      was a victim of sexual, physical or emotional abuse before committing the offense

    H.      provides the results of any mental health assessment, risk assessment or evaluation as to rehabilitation.

Fla Stat. § 921.1402.  The juvenile lifer is entitled to counsel at this review hearing, has the right to hire experts to make mental health, rehabilitation and risk assessments, can attend the hearing, and has a right of appeal.

    60.    In 2015, the Florida Supreme Court held that the 2014 Juvenile Sentencing Statute would apply retroactively to any juvenile offender serving an LWOP sentence in Florida. *Falcon v. State,* 162 So. 3d 956 (Fla. 2015).

### Florida Supreme Court Holds Parole Process Does not Provide a Meaningful Opportunity for Juveniles Sentenced to LWP (*Atwell*) but Reverses Course Two Years Later (*Franklin*)

    61.    In 2016, the Florida Supreme Court considered whether Florida's parole system gave individuals sentenced to LWP a meaningful opportunity for release as required by *Graham* and *Miller.*  Angelo Atwell challenged his LWP sentence for a homicide committed when he was a juvenile as violating the Eighth Amendment; his PPRD

(presumptive parole release date) was set for 2130, one hundred forty years after the offense. The Florida Supreme Court held that a life with parole sentence violated *Miller* because Florida's parole system was not designed to consider the defendant's lessened culpability as a juvenile and did not provide him a meaningful opportunity for release during his lifetime. *Atwell v. State*, 197 So. 3d 1040, 1050 (Fla. 2016).

62.     The *Atwell* court noted that because Florida's parole statute required the Commission to "give primary weight to the seriousness of the offender's present and past criminal offense and the offender's past criminal record," *id.* at 1047 (quoting Fla. Stat. § 947.002), all but 84 of the 1,686 months in Atwell's PPRD were attributable to "static factors, such as the crime he committed and his other crimes." *Id.* at 1044. The court emphasized that the Commission is not required to consider mitigating circumstances in setting the PPRD, and even if it did so, the mitigating circumstances enumerated in the Florida Administrative Code "do not have specific factors tailored to juveniles." *Id.* at 1048.

63.     The Florida Supreme Court concluded that Atwell's sentence was unconstitutional under *Miller* because it "effectively resemble[d] a life without parole sentence, and he did not receive the type of individualized sentencing consideration *Miller* requires." *Id.* at 1050. The *Atwell* court noted that the Florida Legislature had chosen to pass the 2014 Juvenile Sentencing Statute with judicial proceedings instead of relying on the nearly extinct parole system to provide the meaningful review and realistic opportunity for release required by *Graham* and *Miller*.

64.     Following the *Atwell* decision, all juvenile lifers – those serving either

LWOP or LWP sentences – were entitled to be resentenced in court pursuant to the 2014 Juvenile Sentencing Statute. Following *Atwell*, there were approximately 300 juvenile LWP lifers who were then entitled to receive a resentencing in a court of law under Florida's 2014 Juvenile Sentencing Statute. Ninety (90) of those juveniles serving LWP sentences actually received a resentencing. Sixty-three (63) of the 90 – or 70% of those who were resentenced – were released from prison and many are now leading productive lives. Exhibit A at 7.

65.     Because of the backlog of resentencing cases and the need to develop witnesses and evidence of rehabilitation, not all juveniles serving LWP sentences had completed the resentencing process before the Florida Supreme Court reversed its *Atwell* holding two years later. In 2018, following a change in the composition of the court, the Florida Supreme Court receded from its *Atwell* decision in *State v. Michel*, 257 So. 3d 3 (Fla. 2018), and then directly reversed itself in *Franklin v. State*, 258 So. 3d 1239 (Fla. 2018) (per curiam).

66.     *Franklin* considered the sentence of a non-homicide juvenile offender sentenced to concurrent 1,000-year sentences with the possibility of parole. The Commission had set Franklin's PPRD at year 2352 based on the existing parole guidelines. The trial court held that because Franklin had the possibility of parole – albeit more than three centuries from now – he was not entitled to a resentencing under the 2014 Florida Juvenile Sentencing Statute.

67.     Despite acknowledging that the PPRD was "set far beyond Franklin's life expectancy" and was not likely to change, *Franklin,* 258 So. 3d at 1241, the Florida

Supreme Court concluded that it did not violate the U.S. Supreme Court mandates of *Graham* and *Miller.*

68.     The majority opinion in *Franklin* undertook no analysis of Florida's parole system, nor did it address the holding in *Atwell* that individuals whose PPRDs far exceed their life expectancy—like Atwell and Franklin—have no meaningful opportunity for release during their lifetimes through Florida's parole process because of its primary reliance on the person's offense and failure to consider their youth at the time of the offense or subsequent demonstrated maturity and rehabilitation.  Neither the *Atwell* nor *Franklin* decisions were based on an evidentiary record developed to show that the Commission's customs, policies and practices as applied resulted in the imposition of *de facto* life sentences to juvenile offenders such as Plaintiffs and the Class Members whose PPRDs exceed their life expectancies.

69.     As a result of *Franklin/Michel*, the remaining juvenile lifers, including the Plaintiffs and Class Members here, who had not been among the first 90 who were resentenced pursuant to the 2014 Juvenile Sentencing Statute, now found the courthouse door slammed shut.   Plaintiffs and most Class Members already had their resentencings scheduled or in some cases the resentencing hearing had already occurred, and they were simply awaiting the court's written decision.  Plaintiffs and the Class Members are no different than the 90 who received resentencings in court and the 63 who were thereafter released, yet now they have only one avenue for proving their maturity and rehabilitation: the Florida parole system.

70.     Since 2016, when FIU began keeping track of juveniles serving LWP

sentences for homicide offenses, ***only five people*** have been released on parole.  Exhibit A at 7.  In three instances, the individuals were represented by counsel, which is not guaranteed as of right in Florida.  *Id.*

## Florida's Deficient Parole System and Sentencing for Youth

71.     The parole system is administered by FCOR pursuant to Chapters 947-949 of the Florida Statutes.  FCOR is comprised of three commissioners who are appointed by the Governor and Cabinet.  FCOR describes itself as a quasi-judicial decision-making body which administers parole, conditional medical release, control release, conditional release, and addiction release supervision.  It also acts as the administrative and investigative arm of the Governor and Cabinet who sit as the Board of Executive Clemency.  Clemency includes not only pardons but also restoration of an offender's rights, including the right to vote.

72.     According to FCOR's most recent annual report, it spends over half of its time on clemency matters, 26% of its time on conditional/control release and only 12% of its workload by hours on parole and conditional medical release.  FCOR 2019 Annual Report 7, *available at*  https://www.fcor.state.fl.us/docs/reports/AnnualReport2019.pdf (accessed Oct. 14, 2020).

73.     FCOR also hires and supervises a Victim Advocate who coordinates with, assists, and advocates for victims and their families during the parole process.  The Victim Advocate's office is in the same building as the Commissioners and the Victim Advocate is permitted to have *ex parte* communications with the Commissioners. The Victim Advocate also coordinates with the state attorneys' offices.  Upon information and belief, the Victim Advocate advises victims and families to request that the Commission impose the maximum amount of time between FCOR meetings (seven years) to determine parole eligibility.

74.     As of June 30, 2019, there were 4,117 individuals in Florida – adult and juvenile offenders – who were eligible for parole.  In fiscal year 2018-19, the Commission made 1,454 parole determinations and released on parole 27 individuals (adult and juvenile offenders), or 0.65% of those eligible for parole.  *See* FCOR 2019 Annual Report at 6, 8.

75.     While describing itself as "quasi-judicial," FCOR is not an independent, impartial body.    FCOR in its 2019 Annual Report states that one of its "operation accomplishments" is the fact that it "[a]ssisted various State Attorney offices regarding juvenile resentencing."  FCOR 2019 Annual Report at 10.

76.     On information and belief, the Commissioners have no specialized experience or training in mental health, risk assessment, or other relevant disciplines that would enable them to make informed judgments about whether a juvenile is permanently incorrigible or has demonstrated sufficient maturity and rehabilitation to merit release.  FCOR does not solicit or employ experts who could offer such assessments or opinions regarding juvenile lifers.

77.     FCOR is responsible for developing objective parole guidelines upon which parole decisions are based.  Fla. Stat. § 947.165(1).  Those guidelines are supposed to be developed according to "an acceptable research method and shall be based on the seriousness of offense and the likelihood of a favorable parole outcome."   *Id.*   The guidelines do not identify any research method used.  FCOR is required to annually review its guidelines and make revisions "considered necessary by virtue of statistical analysis of commission actions, which analysis uses acceptable research and methodology."  *Id.* at § 947.165(2).  The Commission does not make this statutorily required annual evaluation.

There have been no revisions to the parole guidelines since 2014.

78.    Florida's parole statute directs that the "primary weight" to be given in developing the objective parole criteria is "the seriousness of the offender's present criminal offense and the offender's past criminal record." Fla. Stat. § 947.002(2).  The parole statute further states that "[i]t is the intent of the Legislature that the decision to parole an individual from the incarceration portion of the individual's sentence is an act of grace of the state and shall not be considered a right."  *Id.* at § 947.002(5).

79.    Nowhere in the parole statute is the Commission required to consider any of the factors that a court is required to consider under U.S. Supreme Court case law and Florida's 2014 Juvenile Sentencing Statute, such as the defendant's age, maturity, mental and emotional health at the time of the offense, the defendant's home and community life, the effect of immaturity and impetuosity on the defendant's participation in the offense, or the maturity and rehabilitation of the defendant since the offense.  To the contrary, since the parole process is driven by current offense and past criminal record, the parole statute specifically states that "[n]o person shall be placed on parole merely as a reward for good conduct or efficient performance of duties assigned in prison."  Fla. Stat. § 947.18.

80.    An individual becomes eligible for parole consideration between six and eighteen months before the expiration of his or her minimum mandatory sentence at which time the individual is interviewed by an FCOR examiner ("Investigator"). Fla. Admin. Code R. § 23-21.006.  This interview, and any subsequent interview, is automatically terminated and rescheduled if an individual receives a disciplinary report (DR) in prison during the past 90 days, no matter how minor the infraction.  During the initial interview,

the Investigator meets with the individuals and correctional officers at the prison to discuss the individual's institutional conduct.

81.    After the interview, the Investigator recommends to the three FCOR Commissioners a PPRD.  An individual's PPRD is based on a set matrix time range that can be increased by aggravating factors or decreased by mitigating factors.  That matrix time range is determined by the intersection of a saliency factor score and offense severity score.  Both of these scores are based primarily on the facts of the original offense – static factors that an individual can never change.  After that matrix time range is determined, the Investigator may add aggravating or mitigating factors to extend or reduce the PPRD.  The Investigator fills out a short 1-2 page preprinted form with the Investigator's recommendation and some explanation of the basis of the recommendation.  The Investigator does not participate in the subsequent meeting of FCOR where the Commissioners determine the actual PPRD.

82.    The FCOR Commissioners have no face-to-face, telephonic or video contact with the incarcerated individuals.  After receiving the Investigator's report, the FCOR Commissioners have unfettered discretion to change the matrix time range or add additional aggravating or mitigating factors.  The official PPRD is established by FCOR at one of its over 36 parole meetings held each year in Tallahassee and around the State.  Incarcerated individuals are not allowed to appear at these hearings either in person, telephonically or by video.  Visitors (either the victim or victim's family or the inmate's supporters) are given a total of ten minutes for each side to speak.  The victim's family may also choose to have a letter read out loud, to send a representative, or to submit a

video.  *See* Fla. Admin. Code R. 23-21.004 (5).

83.    In fiscal year 2018-19, FCOR made 1,454 parole determinations at its 36 meetings.  This equates to an average of 40 parole determinations at each meeting, or 5 every hour.  This is consistent with the fact that most parole determinations are made at FCOR meetings in a process lasting an average of 10 minutes.

84.    After hearing from the families and supporters of the victim and prisoner, the three Commissioners engage in a verbal scoring session where they compare their preliminary views on the time to assign to the various scoring factors.  Most of their discussion is numbers-driven based on the severity of the crime.  Upon information and belief, there is little to no discussion of whether the prisoner has shown remorse, demonstrated maturity and rehabilitation, or is prepared to lead a productive life outside prison.

85.    After the hearing, the Commission issues an order setting the individual's PPRD.  An inmate has 60 days to request a review from FCOR of its determination.  Fla. Admin. Code R. 23-21.012(1).  If a review is requested, the Commission holds a meeting and submits an order denying or affirming the request.  The Commission is not required to submit a detailed response addressing the individual's concerns.

86.    The next step in the parole process is the subsequent interview. Formerly, individuals were re-interviewed by an Investigator every two or five years. In 2010, however, the Florida Legislature expanded the interval to seven years for certain types of offenses, including first- and second-degree murder.  *See* Fla. Stat. § 947.174(1)(b).  With the assistance and, upon information and belief, the prompting of the Victim Advocate, a

Commission employee, the victims and their families almost always request the maximum of seven years. In the subsequent interview, the Commission reviews the individual's institutional conduct since the last interview and may choose to extend, reduce, or make no change to the PPRD. An inmate's PPRD may be extended upon the receipt of even a single disciplinary report, no matter how minor. *See* Fla. Admin. Code R. 23-21.015 (1).

87.    Juvenile lifers continue to have subsequent interviews every seven years until 90 days before their PPRD, at which time they have an effective parole release date ("EPRD") interview with an Investigator. The EPRD (if granted) is the individual's actual release date (the PPRD is only "presumptive").

88.    Three months before the EPRD interview, the Commission notifies the individual's original sentencing judge or, if this judge is unavailable, the chief judge of the sentencing court of the pending meeting to decide the actual release date. If the judge submits a judicial objection, the PPRD may be extended. *See* Fla Admin. Code R. 23-21.015 (1). Upon information and belief, the sentencing judge or chief judge are not provided information regarding the individual's maturation and rehabilitation. Their input, if any, is based solely on the facts of the original offense.

### The FIU Study

89.    The Florida Juvenile Resentencing and Review Project at the FIU College of Law ("FIU Project") was created in 2015 to provide consultation and training for attorneys who represent juveniles in the adult system, collect data in the wake of the Supreme Court's decisions in *Miller* and *Graham*, and advise on policy and legislation affecting juveniles in Florida who are prosecuted as adults.

90.    In 2019, the FIU Project undertook an analysis comparing, on the one hand, the Florida parole process and outcomes for juveniles sentenced to LWP with, on the other hand, the process and outcomes experienced by juveniles sentenced to LWP who were resentenced in court and represented by counsel during the two years that *Atwell* was in effect.  Ex. A.  The FIU Project obtained from FCOR a random sampling of 80 parole files of juveniles who were sentenced to LWP for first-and second-degree murder.  Of the 80 cases analyzed, the majority were black (68%) and male (99%).   Ex. A at 12.

91.    The resulting analysis demonstrates that parole in Florida is largely illusory because FCOR: does not consider an individual's youthfulness at the time of the offense; does not consider maturation or rehabilitation; routinely rejects its own investigators' recommendations; and consistently extends the individuals' PPRD dates.  By comparison to those who received a judicial resentencing, juvenile lifers awaiting parole have and will remain incarcerated decades longer and likely for the remainder of their natural lives.  *Id.* at 30.

92.    Most individuals in the FIU Study (62 out of 80) had had an initial interview with an Investigator, who then submitted a  PPRD recommendation.  The FIU Project found that ***FCOR rejected its Investigators' recommendations in 90.1% of cases and extended the PPRD.***  On average, ***FCOR set an individual's PPRD 174 months (14.5 years) above its Investigator's recommendation.***  *Id.* at 13.

93.    As discussed earlier, FCOR uses a matrix to determine an individual's baseline PPRD.  Prior to July 2014, juvenile offenders were ***penalized*** for being under 18 at the time of their offense because they automatically received two saliency factor points

for being 17 or younger at the time of the crime.  This means that they actually were given *extended* time (rather than less time) based on their youth at the time of their crimes.  Forty cases (65%) in the FIU Study had two points added to their saliency factor due to youthfulness.  These individuals have never had their PPRD retroactively recalculated although since 2014 the fact of being a juvenile at the time of offense is no longer used to increase the saliency score.  *Id.* at 15-16.

94.    After July 2014, the only change FCOR made to its rules to conform with the mandates of the Supreme Court was to remove the enhanced penalty (the additional two saliency factor points) for being a juvenile at the time of the crime and to create a youthful offender matrix for scoring juvenile offenders.  The youthful offender matrix has ranges that are lower by between four and six years than the matrix for adults.  Some, but not all, of the individuals in the FIU Study were scored on the youthful offender matrix, but the majority (61%) of individuals who have had an initial interview were not scored as youthful offenders and many had their PPRDs increased based on their youth.  *Id.* at 16.

95.    The dropping of the penalty for being a juvenile offender and providing a supposedly more lenient sentence scoring has not, however, resulted in treating youth differently than adult offenders.  Any potential reduction in the PPRD based on using the youthful offender matrix is routinely cancelled out by the overwhelming use of aggravating factors by the Commission to impose PPRDs that are typically well beyond the life expectancies of juvenile lifers.

96.    The FIU Study determined that of the 80 parole files it reviewed, **FCOR applied aggravating factors in every single case**.  A typical individual received 198.6

months (16.5 years) from the matrix time range and, *on top of that*, 552.6 months (46 years) of additional aggravation. *Id.* at 16-17.

97.     Most of the aggravating factors in the 80 files in the FIU Study related to an individual's past record and do not change. These so-called "static aggravators" are related to the individual's juvenile years; the individual has no control over them post-incarceration and they have no bearing on the individual's maturation or rehabilitation. The FIU Study found that these static aggravators were applied in 88% of cases. *Id.*

98.     While FCOR applied aggravating factors in every single one of the 80 cases to increase the time for a PPRD, there was ***not one single case in which FCOR applied a mitigating factor to reduce the time for a PPRD***. *Id*. at 19. To the contrary, factors that the 2014 Juvenile Sentencing Statute requires to be considered as mitigating factors such as mental health and substance abuse were actually used by the Commissioners as aggravating factors to increase an inmate's PPRD. *Id.*

99.     The FIU Study also showed that individuals forced to seek release through parole served many more years and would be many years older than individuals who received judicial resentencings through the 2014 Juvenile Sentencing Statute. The FIU Study found that individuals who went through a resentencing in the court system after *Atwell* and before the process was shut down by *Franklin* were on average 51 years old when released by the courts. *Id.* at 29. However, juvenile offenders now relegated to the parole process will be 95 years old on average – assuming they are actually released – according to their most recent PPRD dates. *Id*. at 30. In other words, those juvenile lifers forced into the parole process for release are generally expected to serve almost twice as

long as those juvenile lifers who received a judicial resentencing.

100.    The FIU Study confirmed that none of the juvenile offenders serving LWP sentences who were not resentenced in the brief two-year window opened by *Atwell* and closed by *Franklin* ever received a judicial resentencing.  For Plaintiffs and the Class, there was no judicial finding at their original sentencing – nor at any subsequent proceeding  (and they have had no judicial resentencing) – that they were among the rare juveniles who are so irreparably corrupt, incorrigible and  incapable of rehabilitation such that they should be condemned to die in prison.

101.    The FIU Study demonstrates, through the use of objective and verifiable statistics, that the average individual who was sentenced to life in prison with the possibility of parole for a crime committed as a juvenile will never live outside the prison walls. In short, there is no meaningful opportunity for release for the Plaintiffs or Class Members serving LWP sentences in the state of Florida.  They are each serving unconstitutional *de facto* life without parole sentences.

102.    The FIU Study also demonstrates and highlights the many differences between a judicial resentencing and the parole process in Florida, as demonstrated by the chart below:

|  | **Judicial Resentencing** | **Parole Process** |
|---|---|---|
| Sentencer | Judge | 3 Parole Commissioners |
| Hearing | Multi-Day Court Hearing | 10-Minute Meeting |
| Right to Attend? | Yes | No |
| Right to Counsel? | Yes | No |

| | | |
|---|---|---|
| Right to Experts? | Yes | No |
| Right to Cross-Examine Witnesses? | Yes | No |
| Right to Present Witnesses/Evidence? | Yes | No |
| Required Consideration of *Miller* factors (youth, background, etc.? | Yes | No |
| Sentencing Determination of whether inmate is one of few juveniles who is irreparably corrupt? | Yes.  Judge makes that finding at conclusion of resentencing after weighing evidence, including that of experts. | No. FCOR does not make this finding. Commissioners have no specialized mental health expertise and do not have input from mental health and risk assessment experts. |
| Consideration of rehabilitation and reform required? | Yes | No.  Parole statute "designed to give primary weight to the seriousness of the offender's [criminal conduct]."  FCOR primary focus is on offense. |
| Right to release upon sufficient showing of remorse, maturity and rehabilitation? | Yes.  Constitutional right. | No.  Parole is "act of grace." |
| Rate of Release | 70% of Juvenile Lifers released after resentencing hearing | Less than 5% of Juvenile Lifers released by FCOR |
| Average Age at Release | 51 years | 95 years |
| Average Time Served in Prison | 30-35 years | 74-83 years |

## INDIVIDUAL PLAINTIFFS

### Plaintiff Robert Earl Howard

103.    In 1981, at 17 years old, Robert Earl Howard was in 11th grade and had no prior offenses.  Under the influence of an older co-defendant, he became involved in a robbery.  They entered the home of the victim and, during the course of the robbery, the victim was killed.

104.    For the murder, Robert Howard was sentenced to life in prison with the possibility of parole after 25 years.  There was nothing in Robert's background to suggest, nor was any finding made at the time of his sentencing, that his crime reflected that he was among the rarest of juveniles whose crime reflected permanent incorrigibility.

105.    Mr. Howard became parole-eligible in 2007.  He is now 56 and has been incarcerated for 39 years.  He has come before the Commission on four occasions: in 2005, 2010, 2012, and 2017.  His current PPRD is set for 2054 when Mr. Howard will be 91 years old – which is 30 years beyond the average life expectancy of a black man like Robert Howard who was born in 1963.  *See* CDC Life Expectancy Tables (2017) (available at www.cdc.gov/nchs/data/hus/2017/015.pdf) (Ex. B).   This is more than a de facto life sentence.

106.    Each time the Commission has met on Mr. Howard's case it has focused almost exclusively on the facts of the crime and ignored the substantial and overwhelming evidence of Mr. Howard's demonstrated maturity and rehabilitation.  Mr. Howard had no counsel to represent him at any of the Commission meetings, had no opportunity to attend, participate or listen to the proceedings before the Commission or review the information

submitted to the Commission.  At each meeting, the Commission spent an average of 10 minutes considering Mr. Howard's parole eligibility.

107.    While the Commission made no note of Mr. Howard's record of rehabilitation, by contrast, when Mr. Howard's case came before the Second District Court of Appeal of Florida, a concurring judge wrote extensively to describe why he believed that "Mr. Howard's story is extraordinary and is worth telling." *Howard v. State*, 180 So. 2d 1135 (Fla. 2d DCA 2015) (Altenbernd, J.).  Judge Altenbernd acknowledged that "Mr. Howard committed some terrible crimes.  But the story has a twist." *Id.* at 1136. The twist was that in the last 25 years, Mr. Howard had received not one single disciplinary report as a prisoner.  As the judge stated, "[f]or those unfamiliar with prison discipline, that is an extraordinary feat.  I confess that I probably could not achieve that record if imprisoned for twenty-five years." *Id*.  It has now been 35 years during which Mr. Howard has not received a single disciplinary report.

108.    Judge Altenbernd, unlike the Parole Commission, also took note of and detailed how Mr. Howard began turning his life around almost immediately upon his incarceration and earned his GED the same year he was incarcerated.  Beginning in 1991, he was selected to work for PRIDE (Prison Rehabilitative Industries and Diversified Enterprises, Inc.)—a nonprofit enterprise which trains eligible individuals in vocational skills to prepare them for re-entry into communities as productive citizens. Being selected for the PRIDE program is a highly sought-after position and is only awarded to those who have earned the trust of correction officers who select the participants.  As of 2020, he has earned over 18 certificates that would qualify him for jobs on the outside including

Electronics, Cabinet Shop, Gas Engines, Warehouseman, Power Industrial Trucks Operator, PC Computer Support Services, Commercial Foods & Culinary, Upholstery, Brick & Block Masonry, Turf Management, Environmental Services and Plumbing. For ten years, he operated and trained others on various machinery positions such that UPS drivers were asking when he would get out because they wanted to recommend him for a job.

109.    In addition to completing numerous job-training courses to position him to live a productive life outside the walls of prison, Mr. Howard also completed numerous self-betterment courses in anger management, life skills, AA, AIDS awareness, yoga, and substance abuse.

110.    At each of the four times the Commission considered parole for Mr. Howard, it rejected the recommendations of the Investigator—the person who actually met with Mr. Howard to assess his remorse, his remediation efforts and his ability to succeed outside prison—and instead imposed harsher conditions of either delaying his PPRD or increasing the time before the next Commission action. The Commission also ignored the recommendations of those who have the most knowledge of Mr. Howard's rehabilitative efforts, such as the correction officers who supervise him on a daily basis.

111.    At his first in-person interview in 2005 with an Investigator, the Investigator noted that Mr. Howard had been free of any disciplinary reports for twenty years and recommended that his PPRD be set for 2015. The Parole Commission, examining the same set of facts, increased the aggravation from the recommended 166 months to 972 months, a nearly six-fold increase. The Commission rejected the recommended PPRD date of 2015,

instead adding 47 years for an initial PPRD of 2062.  The two-page form recording the Commission's action listed only aggravating factors based on his original crime and made no mention of any mitigating factors. Ex. C. (PPRD Commission Action, Oct. 8, 2005)

112.    At the first Commission meeting, the State Attorney whose district prosecuted Mr. Howard, Jerry Hill, spoke at length and focused solely on the facts of the crime. Mr. Hill misstated facts to the Commission but because Mr. Howard was not permitted to attend the hearing and he was not afforded counsel, there was no one there to correct Mr. Hill's misstatements to the Commission.

113.    Mr. Hill also attended the second time the Commission considered Mr. Howard for parole in 2010.  Focusing again only on the original offense, Mr. Hill stated: "There appears to be no internal braking mechanism on this human being."  At that point, it had been 25 years since Mr. Howard had received one single disciplinary report.  It is alleged, upon information and belief, that Mr. Hill, who is a frequent opponent of parole at the meetings of the Parole Commission, did not review Mr. Howard's rehabilitative efforts because the facts of the crime committed by a 17-year old Robert Howard was Mr. Hill's sole focus.

114.    If Mr. Hill had reviewed the parole file, he would have seen the letter from Mr. Howard's classification officer who wrote:

> During my years as a classification officer, I have not seen many individuals as dedicated to rehabilitation as inmate Howard. He always carries himself in a positive manner, respects both officer and inmate alike, and he continuously betters himself by learning new trades and participating in self-betterment programs.

(Ex. D) (Letter from Classification Officer Smith dated March 10, 2010). Mr. Smith then

listed the over two dozen credits and accomplishments Mr. Howard had achieved, concluding "I believe he is rehabilitated and would be a very good candidate for parole." *Id.*

115.    Despite the recommendation from its Investigator and the unusually strong recommendation from someone who had a deep knowledge of Mr. Howard and his efforts to reform himself, the Commission ignored them both.    While the Investigator recommended reducing Mr. Howard's PPRD by six years, the Commission reduced it by only one year to 2056 (when Mr. Howard would be 93 years of age).

116.    The third time Mr. Howard's release date was considered in 2012, the Investigator recommended that his PPRD be reduced by five years based upon the lack of disciplinary actions, program completion and again, positive remarks from his classification officer.    Again, the Commission rejected its Investigator's recommendation and instead only reduced the PPRD by 2 years.

117.    The fourth time the Commission considered Mr. Howard's PPRD was in 2017.    Once again, his classification officer, Mr. Thurman Smith, submitted another strong letter of support – as he had seven years earlier – stating:

> Since I wrote the last letter of support for Mr. Howard in 2010, my opinion of him has not changed. He still maintains that positive attitude, for which he is so well known, and he is respectful to both inmates and staff members alike. I have absolutely no doubt that he has been rehabilitated and will do well once released. . . . It is time for Mr. Howard to move on and to start the next chapter of his life. He is, in my personal and professional opinion, deserving of a second chance.

(Ex. E) (Letter from Classification Officer Smith, dated Dec. 11, 2017).

118.    On the fourth occasion when the Commission considered Mr. Howard's

PPRD, Prosecutor Jerry Hill once again personally appeared to emphasize the facts of the crime committed 36 years earlier. The Commission again ignored the opinion of the classification officer who had worked with Mr. Howard for over seven years.  It ignored for the fourth time the recommendation of its Investigator.  Despite the fact that a judge on the Second District Court of Appeal for Florida had several years earlier written extensively of Mr. Howard's extraordinary record of rehabilitation, there is no indication the Commission considered that record or Judge Altenbernd's opinion.  The Commission refused to make any changes in Mr. Howard's PPRD, leaving it at 2054, when Mr. Howard would be 91 years of age, 30 years beyond his life expectancy.

119.    In its two-page pre-printed form, attached as Ex. F, there was no mention by the Commission of Mr. Howard's demonstrated maturity and rehabilitation or consideration that he committed the offenses when he was a child.    There was no explanation at all for why the Commission refused to follow the Investigator's recommendation to reduce the PPRD.  The only written explanation in the entire two-page document were four reasons given for why the Commission set the next interview date at the maximum time of 7 years.  Each reason related to the crime a 17 year-old first-time offender Robert Howard committed 39 years ago.  There was no mention of Mr. Howard's "extraordinary feat" as Judge Altenbernd had previously noted of his extensive and successful efforts to rehabilitate himself during the past 39 years.

120.    When Mr. Howard's sister inquired of a staff person with FCOR what would it take for Mr. Howard to be granted parole, the reply was "Your brother is never getting out because of the seriousness of his crime."

**Plaintiff Damon Peterson**

121.    Damon Peterson had a very troubled and unstable home life.  Throughout most of his childhood, his mother abused crack cocaine and had a series of abusive relationships with men.  By the time he was nine, his mother's drug addiction led to her wandering the streets and sometimes not recognizing her own son.  Damon Peterson began committing petty theft when he was 12 years old to provide himself with the basic necessities of life such as food and clothing.  At age 13 and not living with any relatives, Damon asked to be placed into foster care, a cry for help that went unanswered.  In multiple psychoeducational evaluations shared with the courts throughout his juvenile delinquency episodes, doctors specifically recommended that Damon be placed into a stable home environment but a dependency case was never opened.

122.    When he was 16, Damon and two other 16-year-old boys committed the crimes for which  he is serving a life sentence.  While driving around, the three boys saw a rental car they believed was occupied by tourists and they decided to rob them and share the proceeds.  They followed the car to a motel parking lot and watched the victims get out of the car.  Damon Peterson approached the female victim, pointed the gun at her and demanded she hand over her purse.  She refused, he went to grab it, and she yelled for help.  Her husband joined in the struggle.  Damon shot him once, ran back to the car and drove away.  The husband died from the gunshot wound.  Damon later confessed to the crime.

123.    Damon Peterson was charged with first-degree felony murder, not premeditated murder.  This was an armed robbery gone bad and Damon had not entered the situation with an intent to kill.  Nonetheless, at that time in 1994, a 16-year-old boy

could be put to death by the State and the State filed a Notice of Intent to Seek the Death Penalty in his case. The primary goal of Mr. Peterson's public defenders was to save his life which led to a plea agreement for life in prison with the possibility of parole in 25 years.

124.    As part of the plea negotiations, Damon expressed the hope that he could one day rejoin society and indicated that he was motivated to rehabilitate himself and intended to participate in whatever activity he could to better himself as well as others while serving his sentence. The State agreed to write a letter at the end of his minimum mandatory sentence of 25 years recommending that he be "strongly considered" for parole if he had no disciplinary report during that time period, completed his GED, participated in a religious activity and any public service group or program offered. The prosecutor suggested that Damon Peterson should continue his involvement in programs such as Scared Straight, speaking to younger people who visited jails.

125.    During the 28 years he has been in prison, Mr. Peterson has been a model prisoner with only a few disciplinary reports, and none for violent behavior. His last disciplinary report was over 20 years ago. He has participated in every program available to him, including continuing to participate in the "Scared Straight" program. Mr. Peterson credits his Islamic faith for his rehabilitation along with the love and support he has found through his wife, Jacqueline Peterson, who he met through mutual friends and married in 2016. Mrs. Peterson is a nurse who has no criminal record. She has two children whom Mr. Peterson considers to be his family as well. He has job opportunities on the outside and a stable family environment.

126.    After *Atwell* was decided, the State agreed that Mr. Peterson was entitled to a judicial resentencing.  He was two weeks away from his resentencing hearing in the Circuit Court when *Franklin* was decided and the door to the courthouse slammed shut. The State takes the position that the Parole process is now Mr. Peterson's only route to have a meaningful opportunity for release based on demonstrated maturity and rehabilitation.  That route, however, has insurmountable road blocks.

127.    At his initial interview, the Investigator who met with and interviewed Mr. Peterson recommended a PPRD of April, 2027. The Parole Commission, which never saw Mr. Peterson, rejected its Investigator's  recommendation and added another 33 years to the PPRD, setting it for 2060.   The determination was based almost entirely on facts relating to the crime.  While the several page form, attached as Ex. G, documenting the Commission's action has a preprinted notation that the "Commission considered mitigation," there is no explanation of what mitigation evidence was in fact considered and what impact it had on its determination.

128.    The Commission's Investigator recommended that Mr. Peterson be re-interviewed in two years.  The Commission also rejected that recommendation and set the next interview date at the maximum interval of 7 years.  Like its determination to add 33 years to the PPRD, the Commission's action to delay the next interview date was also based almost exclusively on the unchanging facts of the original crime.

129.    At his earliest prospect for release, Mr. Peterson would be 84 years of age and would have spent 67 years in prison.  The average life expectancy for a black man like Mr. Peterson who was born in the 1970s is 62.4 years, *See* Ex. B, and incarceration shortens

life expectancy. *See* Ex. H, "*Michigan Life Expectancy Data for Youth Serving Life Sentences*" (available at http://www.lb7.uscourts.gov/documents/17-12441.pdf (discussing shortened life expectancy of prisoners)).

**Plaintiff Carl Tracy Brown**

130.   On March 26, 1988, a 16-year-old Carl Tracy Brown was drinking with two friends (age 15 and 21) when they decided to steal a car.  They parked their car near a four-way stop, pretending it was disabled. They flagged down the victim in his car and asked him to help them with their vehicle.  Carl Brown approached the victim and shot him six times, killing him.

131.   Following a jury trial,  Carl Brown was convicted of first-degree murder, armed robbery and armed burglary.  For the murder conviction, he was sentenced to life with parole.

132.   In the 32 years he has been incarcerated, Mr. Brown has not had a single disciplinary report recorded in his record.  He was issued one in late 2017 for having a piece of plastic in his window to divert air into his cell which had no air conditioning, but that charge was dismissed.  In 1997, he was issued a disciplinary report because he had a case of protein drinks in his cell to supplement his attempts to work out and maintain his health, but that report was also dismissed.

133.   Mr. Brown has held a variety of jobs while in prison including as an education aide and working in the library.  He worked in the carpentry shop of PRIDE for over 19 years and he credits his job at PRIDE as keeping him out of trouble and free of any disciplinary reports during his years of incarceration.  He worked on cabinet work for

SWAT vans, bookmobiles, mobile clinics and dental labs for the latter part of his teens, his twenties and most of his thirties.

134.    Mr. Brown's brother, Steven Brown, works for United States Air Force in Colorado Springs, Colorado and has offered to provide a home for Mr. Brown upon his release.

135.    At his initial interview for parole in 2016, the Investigator noted that Mr. Brown had received above average work ratings in all the work positions he held.  He also noted that "[s]ince his arrival in prison Brown has never been issued a Disciplinary Report." He noted that Mr. Brown had completed the Faith and Character program and an Inmate Teaching Assistant Training Program.  He also noted a classification officer's comment that Mr. Brown "is not a problem, as evidenced by his disciplinary record."

136.    The Investigator recommended a PPRD of 2023. The Commission rejected this recommendation and focused solely on "aggravating factors" which all stemmed from the crime.  While its one-page form "order" stated that "[d]uring the scoring of this case the Commission did consider mitigation," there is no explanation of what mitigation the Commission considered or what weight, if any, it gave it.  Of the four aggravating factors it listed, all were based on the offense.  The fourth aggravating factor (for which it added 5 years to the PPRD) was that the individual has a history of substance abuse and was under the influence of alcohol at the time he committed the offense when he was 16.  *See* Ex. I (Order of Initial Interview dated Feb. 15, 2016).  The Commission did not discuss the fact that Mr. Brown's record showed no instances of continuing substance or alcohol abuse and that he had received no disciplinary reports in the last 27 years.  The Commission added

47

nine additional years to the PPRD recommended by the Parole Examiner with a date in 2032 when Mr. Brown will be 60 years of age, which is the average life expectancy of a man born in 1960 (who has not been incarcerated for most of his life).  *See* Ex. B.

137.    Mr. Brown was not permitted to attend or in any way participate in the Commission meeting at which his PPRD was set.  He was not provided counsel or any experts to assess his maturity and rehabilitation.  The Commission proceeding lasted about ten minutes.  Mr. Brown was never even provided the Commission's Order setting his PPRD for 2032.

**Plaintiff Willie Watts**

138.    At age 17, Willie Watts, with no prior arrests, came under the influence of an older half-brother and another older friend.  Within a matter of weeks in July 1980, the trio had committed several armed robberies of convenience stores in Putnam and St. Johns counties.   At one store, they kidnapped the clerk, whom a co-defendant (not Mr. Watts) raped outside of Mr. Watts's presence.  The clerk was shot and survived.

139.    It has been noted that juveniles are at a substantial disadvantage to assist in their own defense in criminal proceedings and they respond poorly to pressure and interrogation. *See In re Gault*, 387 U.S. 1, n. 65 (1967); Lindsay C. Malloy et al*., Interrogations, Confessions, And Guilty Pleas Among Serious Adolescent Offenders*, 38 L. & Hum. Behav. 2 (2014); Allison D. Redlich & Reveka V. Shteynberg, *To Plead or Not to Plead: A Comparison of Juvenile and Adult True and False Plea Decisions*, 40 L. & Hum. Behav. 611, 620 (2016); and Barry C. Feld, *Police Interrogation of Juveniles: An Empirical Study of Policy and Practice,* 97 J. Crim. L. & Criminology 219, 228-33 (2006).  Mr.

Watts' case is a good example of that. He did not point to his co-defendants as the ring leaders (and later found out one of them made a false accusation against him). He and his mother, both unfamiliar with the criminal legal system, agreed to follow advice that Willie should plead guilty to all crimes with the expectation that though his crimes were serious, he did not rape or murder anyone and he believed he would get a lighter sentence if he pled guilty. He did not. For the armed robbery crimes in Putnam County, Willie Watts was sentenced to two consecutive 99-year sentences. For the armed robbery, kidnapping and attempted murder crimes in St. John's County, he was sentenced to 75 years to run consecutive (after) he served the 99-year sentences. Under Florida law, the aggregate sentences imposed violates *Graham*. *Henry v. State*, 175 So. 3d 675 (Fla. 2016); *Gridine v. State*, 175 So. 3d 672 (Fla. 2015).

140.    After an initial period of adjustment to prison life at age 17, Willie Watts began to turn his life around. He began to see past his misplaced hatred. Instead of resenting his indefinite life sentence, he began to view that time as a tool to use to prepare himself to live a better life. He became religious and completed his GED. He completed multiple vocational courses and received a coveted spot working with Pride Industries to learn skills he could use to support himself in a life outside prison. He completed all the self-help and growth courses offered by the State.

141.    Mr. Watts became active in the Horizon Communities in Prison program. Horizon holds individuals accountable to improve themselves in seven domains: Attitude, Family, Healthy Choices, Community Functioning, Mentoring, Re-Entry and Faith Formation/Core Belief. Mr. Watts became a "Grandfather" in the self-improvement

program, recognizing him as "the highest change agent and a solid rock of stability in a dorm of 79 bunks."    He is now a canteen operator and still tries to help mentor other prisoners.  Mr. Watts has not received a Disciplinary Report for the last 14 years.

142.    After *Graham* and *Atwell*, Mr. Watts filed a motion for resentencing in Putnam County pursuant to the 2014 Juvenile Sentencing Statute for the robbery crimes in that county.  The resentencing hearing lasted several days.  Mr. Watts was represented by counsel.  He attended the hearing and was able to assist his counsel throughout the hearing. Mr. Watts and his counsel were able to retain experts who testified on the substantial rehabilitation efforts Mr. Watts had made during his almost four decades in prison and that in their opinion Mr. Watts was rehabilitated and able to live a productive life outside the prison walls.  Through this process, Mr. Watts was given the meaningful opportunity the *Graham* court outlined to obtain release based on demonstrated maturity and rehabilitation. In April 2018, the Judge in Putnam County found that Mr. Watts was not one of those juveniles who is irreparably corrupt and who should spend the rest of his life in prison. As a result, the court reduced his 99-year sentences to 40 years, which was set to expire in 2021 when Mr. Watts would be 59 years old.

143.    After having his 99-year sentences reduced to 40 years, Mr. Watts filed for resentencing on his 75-year sentence in St. Johns County on the basis that *Graham* required the Court to give him a meaningful opportunity for release.  However, by the time Mr. Watts went before the court on his motion for resentencing in St. Johns County, the Florida Supreme Court in *Franklin*/*Michel* had already done its about-face, declaring that parole review should be a sufficient process to satisfy the constitutional mandates of

*Graham/Miller*.  As a result, the judge in the St. Johns County case refused to resentence Mr. Watts.

144.    During the proceeding in St. Johns County, the court heard testimony from Laura Tully, the Director of Field Services for the Commission who had reviewed Mr. Watts' parole file before the hearing.  She testified that the Commission first reviewed Mr. Watts' case on April 21, 1982 and had reviewed his case over 20 times since then.  Ex. J (Hearing Tr. at p. 15).  Mr. Watts was not given counsel to represent him at any of the meetings before the Parole Commission.  He was not permitted to attend any of the Commission meetings.  He could not hear much less confront or correct anything anyone else might have told the Commissioners at any of the 20 meetings.  No Commissioner has ever spoken to Mr. Watts or even seen him.  The Investigator who did speak with Mr. Watts does not personally appear before the Commission to answer questions or discuss his interview of Mr. Watts.  Mr. Watts was not afforded an expert to testify as to his demonstrated maturity and rehabilitation.  The entire process before the Commission took on average ten minutes on each occasion.

145.    The last time the Commission reviewed his case was in March 2015 when it set his PPRD for January 2064.  (Ex. K).  Mr. Watts would be 104 years of age on that date, obviously well beyond the life expectancy of 61 years for a black man born in the 1960s.

146.    Ms. Tully admitted that while the Commission may at its next meeting in 2021 consider the fact that the Putnam County judge found Mr. Watts to be rehabilitated and therefore reduced his sentence by more than half, the Commission will not be obligated

to follow the judge's findings. The Commission may or may not make any changes to Mr. Watt's PPRD.

147.    Ms. Tully also admitted that the Commission did not make any changes in the way it considered the cases of juveniles following *Miller* and *Graham*. Nor did the Commission make any changes following the Florida Legislature's adoption of the 2014 Juvenile Sentencing Statute, Fla. Stat. § 921.1401-02 and the factors that should be taken into account in determining whether a juvenile should be released to rejoin society. Ms. Tully admitted that the Commission treats juvenile offenders in the same way it treats those who committed offenses while adults.

148.    Ms. Tully testified that prior to 2008, the Commission could request a mental health status report from the Department of Corrections, "but they quit doing that, so we no longer have a mental health evaluation." She confirmed that the Commission made no formal risk assessment, no mental health assessment and no evaluation of the juvenile offender as to rehabilitation.

149.    In the last four times FCOR has considered Mr. Watts for parole, the Investigator has recommended a reduction in his PPRD (set for 2064 when he would be 104 years old) ranging from two to five years based on Watt's above satisfactory institutional conduct and his successful completion of numerous programs. Each time the Commissioners have rejected the Investigator's recommendation and made no change in Watt's PPRD based solely on the facts of the crime he committed when he was a child. The Commissioners gave no weight to or discussion of the substantial evidence of Mr. Watt's maturity and rehabilitation or the length of time he has already served.

## CLASS ACTION ALLEGATIONS

150.    Plaintiffs bring this action on behalf of a class consisting of: All persons who (i) were convicted of a crime committed when they were under the age of eighteen; (ii) were sentenced to life in prison or a term of years exceeding their life expectancy; (iii) are currently in the custody of the Florida Department of Corrections; and (iv) are or will become eligible for release to parole supervision but only through the parole process. Excluded from the class are individuals meeting the class definitions, but who were paroled and were reincarcerated due to parole violations.

151.    This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

A.    The proposed class is so numerous that joinder of all of its members is impracticable. In Florida, there are over 100 persons currently serving life sentences with the possibility of parole for offenses committed between the ages of 13 and 17;

B.    The questions of law and fact presented by the Plaintiffs are common to other members of the class. Such questions include, generally, whether, under federal law, Defendants have violated the class members' rights to due process, equal protection, to proportionate punishment and to be free from cruel and unusual punishment, and whether Defendants' rules, policies and practices deny Plaintiffs and Class Members a meaningful opportunity for release upon demonstrated rehabilitation and maturity. These common questions of law and fact include:

(1).    Whether Florida's laws governing parole release violate Plaintiffs' and Class Members' Eighth Amendment rights to be free of disproportionate punishment;

(2).    Whether Defendants' policies and practices for conducting parole review, which consider primarily the nature of the crime committed by the juvenile and the juvenile's criminal history, are contrary to the mandates of *Graham*, *Miller* and *Montgomery* and therefore violate Plaintiffs' and Class Members' Eighth Amendment and Due Process rights;

(3).    Whether the practices and procedures of FCOR, including denying Plaintiffs and Class Members a right to counsel and a right to be present at FCOR meetings, and the right to see and confront evidence against them, and providing only cursory review of parole requests, precludes an opportunity for Plaintiffs and Class Members to be meaningfully heard in violation of the Due Process clause;

(4).    Whether Plaintiffs and Class Members have been denied equal protection of the law when others similarly situated have received judicial resentencing hearings pursuant to the 2014 Juvenile Resentencing Statute instead of the parole process; and

(5).    Whether Plaintiffs and Class Members have been denied their Sixth Amendment right to judicial reconsideration when Florida has selected judicial reconsideration as the means to assure juvenile offenders their rights under *Miller*

and *Graham*.

152.    The violations alleged by the Named Plaintiffs are typical of those suffered by the Class and the entire Class will benefit from the relief sought.

153.    Named Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' counsel have experience in federal civil rights class-action litigation.

154.    The prosecution of separate actions by Plaintiffs and individual Class Members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class.  Fed. R. Civ. P. 23(b)(2).

155.    Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

## COUNT I

### VIOLATION OF THE EIGHTH AMENDMENT'S PROHIBITION ON CRUEL AND UNUSUAL PUNISHMENT UNDER 42 U.S.C. § 1983 (ALL DEFENDANTS)

156.    Plaintiffs repeat and reallege  paragraphs 1-155 as if fully set forth herein.

157.    Defendants, in their official capacities, have acted and are acting under color of state law.

158.    The Eighth Amendment to the U.S. Constitution forbids a statutory scheme that mandates life imprisonment for juvenile offenders or permits the imposition of life sentences on juveniles who have not been determined to be irreparably corrupt or permanently incorrigible without providing them a meaningful opportunity for release

based upon demonstrated maturity and rehabilitation.

159.    As set forth herein, Florida Statutes Ch. 947 and Florida Administrative Code §§ 23-21.006 to 23-21.0161 as well as Defendants' current policies, procedures, and customs with respect to the parole review process for Plaintiffs and plaintiff class members, fail to provide a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation as well as failing to provide (1) a right to counsel and opportunity to be effectively represented by counsel, (2) a right to experts or investigators or psychological testing to show the individual has demonstrated sufficient maturation and rehabilitation, (3) sufficient time for a parole hearing, (4) opportunity for FCOR to consider factors of youth as well as maturation and rehabilitation commensurate with the statutory factors adopted by the Florida Legislature in Fla. Stat. §§ 921.1401 and 921.1402, (5) differentiated procedures for juvenile and adult offenders, (6) adequate explanation by FCOR of the basis of its determinations, (7) opportunity for reconsideration of FCOR decisions within a reasonable amount of time, and (8) opportunity for judicial or appellate review of whether Plaintiffs or those similarly situated have demonstrated maturity and rehabilitation.

160.    This statutory framework as well as Defendants' policies, procedures, and customs lack legitimate penological justification, are arbitrary and capricious, and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

161.    Plaintiffs and plaintiff Class Members have been injured and will continue to be injured as a consequence of Defendants' parole policies and practices denying them

their rights to a meaningful opportunity for release from imprisonment based on a demonstration of maturity and rehabilitation, in violation of the Eighth Amendment to the U.S. Constitution.

## COUNT II

### VIOLATION OF THE FOURTEENTH AMENDMENT'S GUARANTEE OF DUE PROCESS UNDER 42 U.S.C. § 1983 (ALL DEFENDANTS)

162.    Plaintiffs repeat and reallege paragraphs 1-155 in this Complaint as if fully set forth herein.

163.    Defendants, in their official capacities, have acted and are acting under color of state law.

164.    Under established U.S. Supreme Court case law, juvenile lifers have a liberty interest in "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," that is protected by the Due Process clause. *Graham*, 560 U.S. at 75; *Miller*, 567 U.S. at 489.

165.    Florida Statutes § 947 and Administrative Code §§ 23-21.006 to 23-21.0161 and Defendants' policies, procedures, and customs with respect to the parole review process for Plaintiffs and plaintiff class members, violate Plaintiffs' rights to due process by failing to provide Plaintiffs and plaintiff class members with (1) a meaningful opportunity for release upon demonstrating their maturation and rehabilitation, (2) a right to the effective representation of counsel, (3) a right to retain experts or investigators or psychological testing to show the individual has demonstrated sufficient maturation and rehabilitation, (4) sufficient time for Commissioners to review the record and conduct a

parole hearing, (5) procedures which distinguish between juvenile and adult offenders in accordance with U.S. Supreme Court case law, (6) adequate explanation by FCOR of the basis of its determinations, (7) opportunity for reconsideration of FCOR decisions within a reasonable amount of time, and (8) opportunity for judicial or appellate review of FCOR decisions, including whether Plaintiffs have demonstrated maturity and rehabilitation.

166.    Plaintiffs and plaintiff Class Members have been injured and will continue to suffer  injury as a result of Florida's statutory framework and Defendants' official policies and practices, which fail to adequately distinguish between persons serving life sentences for crimes committed as children and those committed as adults, and Defendants' failure to provide sufficient procedural protections necessary to secure the substantive right to release upon a showing of maturity and rehabilitation in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT III

### VIOLATION OF THE FOURTEENTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION UNDER 42 U.S.C. § 1983 (ALL DEFENDANTS)

167.    Plaintiffs repeat and reallege paragraphs 1-155 in this Complaint as if fully set forth herein.

168.    Defendants, in their official capacities, have acted and are acting under color of state law.

169.    Defendants, by their policies, procedures, customs and practices have transformed Plaintiffs' and the other Class Members' LWP sentences into *de facto* LWOP sentences.

170.    The 2014 Juvenile Sentencing Statute, Florida Statutes ch. 947, and Florida Administrative Code §§ 23-21.006 to 23-21.0161, on their face and as applied to Plaintiffs, and Defendants' policies, procedures, customs and practices violate the Equal Protection Clause of the Fourteenth Amendment by depriving Plaintiffs and the other Class Members of their equal rights to judicial reconsideration as provided to those juvenile offenders serving *de jure* LWOP sentences.

171.    The 2014 Juvenile Sentencing Statute, Florida Statutes ch. 947, and Florida Administrative Code §§ 23-21.006 to 23-21.0161, on their face and as applied to Plaintiffs, and Defendants' policies, procedures, customs, and practices violate the Equal Protection Clause of the Fourteenth Amendment by depriving Plaintiffs and the other Class Members of their equal rights to judicial reconsideration as provided to those juvenile offenders serving life with parole who received judicial resentencing hearings after *Atwell* but before *Franklin*, between 2016 and 2018.

## COUNT IV

### VIOLATION OF SIXTH AMENDMENT UNDER 42 U.S.C. § 1983
### (ALL DEFENDANTS)

172.    Plaintiffs repeat and reallege paragraphs 1-155 in this Complaint as if fully set forth herein.

173.    Defendants, in their official capacities, have acted and are acting under color of state law.

174.    Defendants by their policies, procedures, customs and practices have transformed Plaintiffs' and the other Class Members' LWP sentences into *de facto* LWOP sentences. While juvenile lifers' constitutional rights to a meaningful opportunity for

release under *Graham* and *Miller* could be satisfied in any number of ways, the Florida legislature adopted a judicial resentencing scheme to implement the requirements of *Miller* pursuant to the 2014 Juvenile Sentencing Statute.  Because judicial reconsideration pursuant to the statute is the chosen method to address these rights, Plaintiffs and the other Class Members are entitled to the same process to accommodate and enforce the very same constitutional rights.

### COUNT V

### DECLARATORY JUDGMENT
### (ALL DEFENDANTS)

175.    Plaintiffs repeat and reallege paragraphs 1-155 in this Complaint as if fully set forth herein.

176.    For the reasons stated above, Plaintiffs seek a declaratory judgment from this Court that Florida Statute ch. 947 and Florida Administrative Code §§ 23-21.006 to 23-21.0161 are unconstitutional on their face and as applied to Plaintiffs and all those similarly situated.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request that this Court:

A.    Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2).

B.    Provide Plaintiffs an evidentiary hearing to further prove that the parole system does not provide Plaintiffs and plaintiff class members a meaningful opportunity for them to demonstrate maturity and rehabilitation or a realistic opportunity

for release as required by the U.S. Supreme Court;

        C.     Declare that the actions and inactions of the Defendants are unlawful and unconstitutional for the reasons specified above;

        D.     Enjoin Defendants from continuing to violate the constitutional and statutory rights of the Plaintiffs;

        E.     Require that Plaintiffs and all class members receive the judicial resentencing protections provided and guaranteed by Florida Statutes §§ 921.1401 and 921.1402, or require Defendants to afford Plaintiffs, and all class members a meaningful opportunity to obtain release with requisite procedural protections and based upon relevant criteria that assess their degree of maturity and rehabilitation in accordance with U.S. Supreme Court mandates;

        F.     Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205; and

        G.     Award all other necessary and appropriate relief that this Court may deem appropriate.

Dated:  January 8, 2021

**HOLLAND & KNIGHT LLP**
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: (904) 353-2000
Fax: (904) 358-1872

By: /s/ *George E. Schulz Jr.*
    George E. Schulz Jr. (FBN 169507)
    buddy.schulz@hklaw.com
    Laura B. Renstrom (FBN 108019)
    laura.renstrom@hklaw.com

    **and**

Tracy Nichols (FBN 454567), Trial Counsel
tracy.nichols@hklaw.com
Stephen P. Warren (FBN 788171)
stephen.warren@hklaw.com
**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel: (305) 374-8500
Fax: (305) 789-7799

Marsha Levick, Trial Counsel
(*pro hac vice* to be sought)
mlevick@jlc.org
Andrew Keats
(*pro hac vice* to be sought)
akeats@jlc.org
Katrina Goodjoint
(*pro hac vice* to be sought)
kgoodjoint@jlc.org
**JUVENILE LAW CENTER**
1800 John F. Kennedy Blvd. Ste. 1900B
Philadelphia PA 19103-7412
Tel: (215) 625-0551

*Attorneys for Plaintiffs*