# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ROBERT EARL HOWARD,
DAMON PETERSON,
CARL TRACY BROWN, and
WILLIE WATTS on behalf of themselves and
all others similarly situated,

     Plaintiffs,

v.

MELINDA N. COONROD,
RICHARD D. DAVISON, and
DAVID A. WYANT in their official capacities,

     Defendants.

_____

Case No. 6:21-cv-00062-PGB-EJK

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In accordance with Fed. R. Civ. P. 56, and based on the undisputed material facts, Plaintiffs have carried their burden in establishing that Defendants and their parole system violate Plaintiffs' constitutional rights under the Eighth and Fourteenth Amendments to a meaningful opportunity for release based on demonstrated maturity and rehabilitation. Plaintiffs' Amended Motion for Summary Judgment (D.E. 104) should be granted and Defendants' Motion should be denied.

## I.   DEFENDANTS ARE NOT ENTITLED TO QUASI-JUDICIAL IMMUNITY

Defendants latest effort[1] to shield the state from accountability for ongoing constitutional violations by asserting a broad right to quasi-judicial immunity should be rejected for the reasons previously argued by Plaintiffs.[2] When Magistrate Judge Kidd denied Defendants' Motion for a Protective Order, he expressly found that Defendants "fail[ed] to present an argument specifically addressing the factors set out in *Cleavinger* as to why immunity should apply." D.E. 73 at 5.[3] In their objection to Judge Kidd's denial, Defendants did not even attempt to show compliance with the *Cleavinger* factors. D.E. 83.  And they have failed to do so here again.

The undisputed material facts confirm that Defendants' parole process does not satisfy *Cleavinger*. Defendants are hired and can be fired for cause by the

---

[1] Defendants first attempt to assert quasi-judicial immunity was in their Motion for Protective Order, when they tried to avoid being deposed about "their judicial or quasi-judicial acts." DE 63 at 3.  Magistrate Judge Kidd denied the Motion (DE 73) and Defendants were required to appear for depositions. Defendants' appealed the Magistrate's ruling (DE 83) but failed to appear for their depositions even though no protective order was in place.  After finally agreeing to appear for depositions the week after the discovery deadline of August 15, Defendants nonetheless refused to answer any questions they believed were covered by quasi-judicial or deliberative privileges – the very privilege Judge Kidd expressly found they had not established.

[2] *See* Opposition to Defendants Motion for a Protective Order and Response to Defendants Objection to the Denial of a Protective Order. DE 69 and 88.

[3] *Citing Cleavinger v. Saxner*, 47 U.S. 193, 202 (1985) for the "[f]actors relevant to whether an official is entitled to absolute immunity," which "include  'the need to assure that the individual can perform his functions without harassment or intimidation,' 'the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct,' 'insulation from political influence,' 'the importance of precedent,' 'the adversary nature of the process,' and 'the correctability of error on appeal.'"

Governor and his Cabinet. Fla. Stat. §§ 947.02 - .03.  By this fact alone, one cannot be assured that Defendants, like judges, are insulated from political influence.

When asked in their depositions about the "importance of precedent," one Commissioner refused to answer the question at all, thereby denying Plaintiffs the opportunity to affirmatively establish facts showing quasi-judicial immunity does not apply.[4] The other Commissioners testified that precedent, whether in prior cases or the same case, has no bearing on the parole process or their decision-making.[5]

Defendants' parole process is not meaningfully adversarial. *See DiBlasio v. Novello*, 344 F.3d 292, 299-300 (2d Cir. 2003) (finding Department of Health's license suspension proceedings lacked essential components like evidentiary rules and subpoena authority). Here, Class Members cannot appear at their hearings (which typically last a few minutes), are not provided all the materials and information upon which Defendants base their parole determinations, are not entitled to counsel, do not have access to experts or psychologists, and cannot cross examine or rebut anything presented against them at hearings. D.E. 104, SOF 26-32. Based on the undisputed material facts, the *Cleavinger* factors strongly weigh against extending quasi-judicial immunity to the Defendants.

Even if Defendants could meet the *Cleavinger* factors, quasi-judicial immunity is an unavailable defense because they are sued here only in their official

---

[4] Ex. 1, Davison Depo Trs. 63:20 – 64:10
[5] Ex. 2 Wyant Depo Trs. 50:5-17; Ex. 3  Coonrad Depo Trs. 159:16-160:2.

capacities for prospective injunctive and declaratory relief. *See* D.E. 69 at 2 -6; D.E. 88 at 8-13.[6] The language added by the 1996 Amendment to § 1983 highlighted by Defendants precludes suits against judicial officers for injunctive relief for their judicial acts only – their individual decisions. D.E. 96 at 10, 42 U.S.C. § 1983. Plaintiffs, however, are seeking an injunction to address the irreparable injury they will otherwise continue to endure as a result of unconstitutional policies, practices, and procedures. They are not challenging their individual parole decisions. Even if Defendants are correct, however, and Plaintiffs are precluded from seeking an injunction, they are still entitled to judgment as a matter of law on their claim for declaratory relief. *See Daker v. Keaton*, No. 20-10798, 2021 WL 3556921, at *2 (11th Cir. Aug. 12, 2021).[7]

Finally, Defendants waived any right they may have had to assert quasi-judicial immunity by failing to raise it in a timely manner.[8] D.E. 69 at 11-12 (citing *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002); *Kennedy v. City of Cleveland*,

---

[6] *See also Shuler v. Swatek*, 465 F. App'x 900, 903 (11th Cir. 2012); *Sultenfuss v. Snow*, 894 F.2d 1277, 1278—79 (11th Cir. 2006); *Smith v. Fla. Parole & Prob. Comm'n*, No. 2:10-CV-668-FTM-36DNF, 2011 WL 6317685, at *6—7 (M.D. Fla. Dec. 16, 2011).

[7] Declaratory relief is necessary here because Plaintiffs' have no other adequate remedy at law. *See Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000). As argued in Section III *infra*, mandamus only permits the circuit court to determine if individual parole decisions are "facially valid," and even then the review is quite limited. Even were it not, a state challenge here has been foreclosed by *State v. Michel*, 257 So. 3d 3 (Fla. 2018) and *Franklin v. State*, 258 So. 3d 1239 (Fla. 2018).

[8] Defendants did not raise the issue of quasi-judicial immunity in their Motion to Dismiss, they did not plead it as an affirmative defense in their Answer, they have not sought to amend their Answer, they did not raise it in response to the class certification motion, and only raised it for the first time in a failed attempt to prevent their depositions.

797 F.2d 297, 300 (6th Cir. 1986); S*ingleton v. Merrill*, No. 21-cv-1291, 2021 WL 5979516, at *7–8 (N.D. Ala. Dec. 16, 2021)).

## II. DEFENDANTS HAVE VIOLATED PLAINTIFFS' EIGHTH AMENDMENT RIGHT TO A MEANINGFUL OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION

### A. The Eighth Amendment Applies to Parole Proceedings

For all of the reasons presented in their Amended Motion for Summary Judgment, Plaintiffs have established that the Eighth Amendment requires that Defendants provide them a meaningful opportunity to obtain their release based on demonstrated maturity and rehabilitation. D.E. 104 at 18-22. Most importantly, this Court has already found that "the constitutional protections recognized by *Graham, Miller, and Montgomery* apply to parole proceedings for juvenile offenders serving a maximum term of life imprisonment."[9] This holding is a necessary extension of the Supreme Court's recognition in *Montgomery* that while "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole," the parole process must be one that "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence." *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016). In the wake of *Montgomery*, numerous courts reached the same obvious conclusion, that the constitutionality of a life with parole

---

[9] D.E. 43 at 15, citing *Flores v. Stanford,* 18CV2468, 2019 WL 4572703, at *8 (S.D.N.Y. Sept. 20, 2019).

sentence necessitates a parole process that meets the same constitutional scrutiny.[10]

Defendants' argument that *Graham*, *Miller*, and *Montgomery* apply only narrowly at the point of sentencing and not to the parole process that determines release defies logic.  It is even more confounding as Defendants pivot from arguing they are just like the sentencing judge for purposes of absolute immunity to distinguishing their process from sentencing with respect to Plaintiffs' constitutional claims. While they are not entitled to immunity, the undisputed material facts demonstrate that Defendants operate an extra-judicial sentencing scheme rather than a parole process that evaluates Plaintiffs for release based on demonstrated maturity and rehabilitation. The Florida parole statutory process is nothing like the Wyoming parole statute that the U.S. Supreme Court in *Montgomery* cited approvingly as a satisfactory response to *Miller*'s mandate.[11] Under the Wyoming statute, parole is actually a possibility at the end of 25 years; in Florida, Defendants' review after twenty-five years is not to consider release of JLWPs but to set the term of their incarceration until a later date when the evaluation for release takes place (the "PPRD"). D.E. 104, SOF 5; Fla. Stat. §947.16.

_____

[10] *See Wershe v. Combs*, 763 F.2d 500, 506 (6th Cir. 2010); *Flores v. Stanford*, 18 CV 246B (VB), 2019 WL 457 2703 at *9 (S.D.N.Y. Sept. 20, 2019); *Funchess v. Prince*, No. 142105, 2016 WL 756530 (E.D. La. Feb. 25, 2016); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 943- 44 (S.D. Iowa 2015); *Diatchenko v. Dist. Att'y for Suffolk Dist*, 27 N.E. 3d 349, 365 (Mass. 2015); *Hayden v. Keller,* 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015); *Maryland Restorative Justice Initiative v. Hogan,* No. ELH-16-1021, 2017 WL 467731 at *21 (D. Md. Feb. 3, 2017).
[11] *Montgomery*, 577 U.S. at 211 (citing Wyo. Stat. Ann. § 6–10–301(c) (2013).

Subsequent reviews every seven years can and do often lead to the PPRD being extended. D.E. 104, SOF 52. When the PPRD is finally reached, it is usually suspended. D.E. 104, SOF 59. As the record shows, the PPRD is an ongoing modification of Plaintiffs' original sentence, which routinely proscribes release for Class Members, on average, for another 50 years. SOF 81. It demands constitutional scrutiny.

Ultimately, life "with parole" must either mean something or they are just magical words invoked to placate the constitutional mandate. Defendants assert they are just magical words.[12] But the sentence is not just the written order; the sentence must be carried out in accordance with prevailing constitutional dictates, which include the possibility of parole *based on plaintiffs' demonstration of growth, maturity and rehabilitation*. As Plaintiffs carry on their lives in prison with this purpose and goal in mind, it is essential that the Eighth Amendment apply equally to state parole systems charged with evaluating a Juvenile Lifer for

---

[12] The Tenth Circuit expressly rejected this logic in applying *Graham* to a term of years sentence that amounted to de facto life without parole. *Budder v. Addison*, 851 F.3d 1047, 1059 (10th Cir. 2017) ("[W]e cannot read the Court's categorical rule as excluding juvenile offenders who will be imprisoned for life with no hope of release for nonhomicide crimes merely because the state does not label this punishment as 'life without parole.' The Constitution's protections do not depend upon a legislature's semantic classifications. Limiting the Court's holding by this linguistic distinction would allow states to subvert the requirements of the Constitution by merely sentencing their offenders to terms of 100 years instead of 'life.' The Constitution's protections are not so malleable.") (footnote omitted) Similarly, Defendants have transformed Plaintiffs' "life with parole" sentences into de facto "life without parole" sentences. DE 104 at 27, fn. 88.

release as to judges when evaluating a juvenile offender for a potential life sentence.[13]

The cases cited by Defendants are inapposite. D.E. 96 at 12, 15-16 (citing *United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019), *Bowling v. Dir. Va Dep't of Corr.*, 920 F.3d 192 (4th Cir. 2019) and *United States v. Morgan*, 727 Fed. Appx. 994 (11th Cir. 2018)); D.E. 105 (citing *Brown v. Precythe*, Nos. 19-2910 & 19-3019, 2022 WL 3725235, — F.4th —(8th Cir. August 30, 2022)). In each of these cases, unlike here, the court explicitly found that the inmate had either received a *Miller*-compliant resentencing, or the state parole systems actually provide the meaningful opportunity envisioned by *Miller*.

In *Sparks*, the Fifth Circuit recognized that the appellant had already been granted a resentencing hearing following *Miller* that lasted five days and involved court-appointed experts, after which the district court judge "carefully examined Sparks's youth and its attendant characteristics in a twenty-six-page memorandum opinion." *Sparks*, 941 F.3d at 753. In *Morgan*, the Eleventh Circuit found that the appellant had been given a resentencing under *Miller* wherein the District Court

---

[13] Just as the Supreme Court in *Montgomery* expressly approved a parole so long as it ensured those whose crimes reflected only transient immaturity were not forced to serve a disproportionate sentence, so too did the Court in *Jones*. In finding that *Miller* does not require a sentencer to make an express finding of "permanent incorrigibility" before imposing a life without parole sentence, *Jones* expressly assumed that any discretionary sentence would flow from a proceeding in which "the sentencer **will** consider the [youthful] murderer's 'diminished culpability and heightened capacity for change,'" and wherein defense counsel will have advanced arguments based on youth and its attendant characteristics. *Jones v. Mississippi*, 141 S. Ct. 1307, 1311, 1316–17, 1319 (2021) (emphasis added).

stated that "when it had first sentenced Morgan in 1993, it was precluded from considering youth, personal characteristics, the circumstances of the crime, and other factors," but that "it was required to consider those factors at his resentencing," and only after careful consideration of those factors did the District Court issue a term of years sentence. *Morgan*, 727 Fed. App'x. 994 at 995-6.

In *Bowling*, the Fourth Circuit was "not persuaded that Appellant's parole proceedings fell below th[e] standard" for a meaningful opportunity for release required by *Graham* and *Miller*. *Bowling*, 920 F.3d at 198. Rather the court found the appellant had been considered for release every year since 2005 based on existing factors that "allowed the Parole Board to fully consider the inmate's age at the time of the offense, as well as any evidence submitted to demonstrate maturation since then." *Id.*

In *Brown*, the Eighth Circuit found that Missouri's parole review process, enacted in 2016 to comply with *Miller* and *Montgomery,* satisfied constitutional scrutiny. The court found that the Missouri statute, like the Wyoming statute in *Montgomery*, provides former JLWOPs an opportunity for parole release at the end of 25 years (age 42 for someone sentenced at age 17). After 45-minute hearings, the parole board is required to consider fifteen factors tailored solely and specifically to assess the inmate's youthful judgment, subsequent emotional and intellectual development, and efforts toward rehabilitation. *Brown*, 2022 WL 3725235 at *1, 4.

Here, it is undisputed that Plaintiffs never received a sentencing (or resentencing) at which the judge was required to and did apply the *Miller* factors. Nor have Plaintiffs been afforded a parole process that provides a meaningful opportunity for release based on demonstrated maturity and rehabilitation. Thus, there is no basis to overturn this Court's own prior ruling that the Eighth Amendment applies to Florida's existing parole process, which does not require consideration of the *Miller* factors.

### B. Defendants' Parole Proceedings Do Not Afford Plaintiffs a Meaningful Opportunity For Release Based on Demonstrated Maturity and Rehabilitation

#### 1. The "Vast Majority" of Class Members Have no Realistic Opportunity for Release

In *Miller*, the Supreme Court held "that a lifetime in prison is a disproportionate sentence for all but the rarest of children." *Miller*, 567 U.S. at 479-80. Nevertheless, since 2012 (the year *Miller* established this right for the Class), Defendants have released only 24 Juvenile Lifers while 170 Class Members still face life with parole sentences.[14] According to Plaintiffs' undisputed material facts, if Class Members are released based upon their PPRD dates, they will have served approximately 75 years and be over 90 years of age, if they live that long. SOF 79, 81.

---

[14] Had the 126 Juvenile Lifers not secured resentencing hearings -- when 98 of them were released -- during the *Atwell* Window, they would still be Class Members, and Defendants' release rate would be just 3-5%. SOF 66. This release rate turns *Miller* on its head given that it is now only the rarest of Juvenile Lifer who is able to secure release.

Defendants counter by claiming that "[o]ver 50% of JLWPs have been paroled." D.E. 96 at 19. This is a number they have pulled out of thin air, offering little by way of explanation for how they calculated this number or why it is relevant, no citation to their own expert's opinion as to how he calculated his release rate (which they do not cite), and apparently based on documents never previously produced to Plaintiffs during discovery. To reach this number, it appears that Defendants looked back historically and concluded that 246 Juvenile Lifers have been paroled since 1943. *Id.* at 8.[15] However, the current parole system for capital offenders –i.e., Class Members -- has only been in place since 1996.[16] For obvious reasons Defendants' 80-year historical analysis is useless in assessing whether Florida's current parole system provides Plaintiffs a meaningful opportunity for release. Indeed, Defendants' own expert would not sign on to such an overreach, recognizing that the "distant past" was not relevant to Plaintiffs' claims. D.E. 104, SOF 62 (Banks Report). Defendants' expert was apparently only willing to consider individuals paroled since 1977 (not 1943) in calculating his release rate of 31%. *Id.*  While Defendants dismissed their own expert's analysis because he would not go back in time far enough or provide a greater release rate,

---

[15] During the expert discovery process Defendants presented this information only in summary form through an excel spreadsheet.  While Plaintiffs asked for the underlying records and backup to be able to have their expert verify the information, Defendants refused to produce it.  Now, after expert discovery has closed and for the first time, Defendants belatedly attach this information (DE 96 Ex. 5) and based their misleading Figures 1 and 2 on it without Plaintiffs' expert being able to review it and rebut it.

[16] *Florida Commission on Offender Review History*, Fla. Comm'n on Offender Review, https://www.fcor.state.fl.us/media.shtml (last visited Sep. 14, 2022).

their expert's analysis suffers the same flaw as their own. There is no basis offered to look back historically to 1977, much less 1943, to ensure that the parole system responsible for all the "beneficial outcomes" of the past offers an apples-to-apples comparison to today's system. Lacking any basis for the analysis, the only reason to go back historically is to arbitrarily capture a larger share of Juvenile Lifers who were paroled under a completely different parole system.[17] Plaintiffs acknowledge far more Juvenile Lifers were released in the 20th century than in the last decade.[18] That tells this Court nothing about whether Florida's current parole system is working in a constitutional manner.

With their 50% release rate a red herring, Defendants further suggest that the undisputed material fact that Plaintiffs' current PPRDs show they will be in their 90s on average when released cannot be relied on because there have been "zero inmates over 70 that have not been paroled." D.E.96 at 19. Ignoring the unanswered question of whether inmates have died before reaching 70, the fact remains that this practice of setting PPRDs some 50 years in the future only came into effect in 1996. Based on the best available evidence of Plaintiffs' PPRD histories and most recent PPRD decisions, most Class Members (who are now in

---

[17] These historical analyses, even if accurate, do not refute the undisputed material facts established by Plaintiffs expert, Dr. Cauffman, who based on her analysis of Plaintiffs experience in the parole system since 2012. Indeed, when asked to calculate the release rate for those paroled after 2012, Defendant's expert confirmed Dr. Cauffman's assertions. Ex. 4, Banks Dep. Tr. 74:8-75:23. And 2012 is a far more meaningful starting point for analysis than 1943 and 1987, not just because it is nearer in time, but because *Miller* was decided in 2012, and thus when Plaintiffs' right to a meaningful opportunity based on maturity and rehabilitation was first recognized.

[18] For example, the Florida Parole Commission released over 4,300 individuals in 1978 compared to the 22 released last year by Defendants. DE 104, SOF 2, 74.

their mid-fifties) will have served over 70 years and not even be considered for parole release until they are in their nineties, if they live that long.

Defendants suggest that current PPRDs are not reliable because they claim it "is the consistent practice of the Commission to amend PPRDs downward as the inmate shows signs that they will be able to successfully reintegrate into society." D.E.96 at 7. By way of support, Defendants provide just *three non-Class Members'* PPRD histories showing they each had their PPRDs reduced on subsequent interviews before they were released to parole. Three non-Class Members' experience is not evidence of a consistent practice. Defendants have the records to support their assertion, if it is true. Producing three cherry-picked examples does not refute Plaintiffs' undisputed material fact that on subsequent interviews of Class Members, Defendants reduced PPRDs in only 7.7% of the cases (for an average of 2.3 years). D.E.104 at 11, SOF 52. Of the twenty-one Class Members who actually reached their PPRDs. all had them suspended and all remain incarcerated from 15 to 23 years past their PPRDs. *Id.* at 12, SOF 58-60. Thus, comparing reductions to extensions, the undisputed material facts confirm that Plaintiffs' calculations regarding likely release rates are indeed conservative, as Plaintiffs' expert asserted.

### 2.    *Defendants' Parole Process Does Not Assess Maturity and Rehabilitation*

While the numbers demonstrate Defendants are not providing a meaningful opportunity for release, the undisputed facts also show that Defendants' policies,

practices and procedures do not consider Plaintiffs' eligibility for release based on demonstrated maturity and rehabilitation.

Defendants assert their parole process is a highly detailed one that "considers if inmates were juveniles when they committed their crimes, as well as their current level of maturity and rehabilitation." D.E.96 at 3. The only factual support offered is a cite to the objective parole guidelines contained in the Florida Administrative Code, and specifically the rule that allows the Defendants to depart from the matrix time range by adding time for aggravating factors and subtracting time for mitigating factors. Rule 23-21.010 F.A.C. The rule identifies a long list of possible mitigating factors Defendants *may* consider, including an inmate's young age at the time of the offense, as well as other mitigating factors that *may* be considered relevant to maturity and rehabilitation. But as the rule makes clear, Defendants are not required to consider any mitigating factors.[19] It is an undisputed material fact, for instance, that they do not consider good, even exemplary, behavior a mitigating factor. 104 at 9-10, SOF 47.

---

[19] Defendants' own testimony on this point is dubious. Each Defendant testified they consider youth and its attendant characteristics, as well as maturity and rehabilitation, but claiming quasi-judicial privilege despite such request being denied by Judge Kidd, they refused to describe what weight these factors are given, how they are evaluated, or how they are applied to a PPRD. DE 104 at 8, SOF 42. Accordingly, their testimony on this point should be ignored. Further casting doubt on this testimony is their acknowledgment that they were not familiar with the 2014 statute, they were not very familiar with *Graham* or *Miller* or any of the Supreme Court cases, or the social science and brain research that has identified the unique developmental differences between children and adults. *See e.g..*, Ex. 2, Wyant Depo. Tr. 19:22 to 36. There is thus no factual basis for Defendants to assert that they consider a set of factors not contained in their laws, rules, policies, or procedures and about which they are largely ignorant.

It is also undisputed that Defendants never identify in their parole decision forms specific mitigating factors considered nor the amount of time they propose for reduction. D.E.104 at 25-26, SOF10-11.  They simply say that they "consider mitigation." *Id.* By contrast, they list every aggravating factor possible to increase and extend a PPRD as long as possible. *Id.*, SOF 40-41.

Even if Defendants can credibly state that mitigating factors including youth are considered, or that maturity and rehabilitation are considered, their consideration is largely irrelevant. In the end, Florida law and the undisputed material facts make clear: Defendants consider parole an act of grace from the state, not a right, and parole decisions are based primarily on the severity of the original offense and the offender's past criminal record. Fla. Stat. §947.002 (2), (5), SOF 4. This guiding principle of the Florida parole system is completely contradictory to the Eighth Amendment jurisprudence regarding Juvenile Lifers and thwarts Plaintiffs' ability to secure release based on demonstrated maturity and rehabilitation.

Compounding an unconstitutional process, Defendants also have not corrected known past violations. It is an undisputed material fact that Defendants set almost half of all Class Members' current PPRDs based on a scoring matrix that added significant time for those incarcerated individuals who committed their offense when they were under 18. D.E. 104, SOF 14-18.  Defendants confirmed that even after they adopted the Youthful Offender Matrix in 2014, they have never

gone back and rescored those Class Members who had been unconstitutionally penalized for their age. *Id.*, SOF 17.

## III.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR DUE PROCESS CLAIMS

Plaintiffs have successfully established the three elements of a due process claim: (1) the deprivation of a constitutionally protected liberty interest; (2) state action; and (3) constitutionally inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003), D.E. 43 at 16. Though Defendants attempt to re-argue that there is no liberty interest at stake, this Court has already held that "plaintiffs have a cognizable liberty interest in meaningful parole review." D.E.43 at 17. This holding is consistent with numerous other courts[20] that have recognized that the substantive rights established for youth by *Graham*, *Miller*, and *Montgomery* – including the constitutionally required "meaningful opportunity to obtain release" – create "a cognizable liberty interest in obtaining parole upon demonstrating maturity and rehabilitation." D.E. 43 at 16 (quoting *Flores*, 2019 WL 4572703, at *10). The primary cases Defendants rely upon are inapposite because they do not examine whether *youth who commit crimes have a liberty interest in parole. See*

---

[20] *See also Flores v. Stanford*, 18CV2468, 2019 WL 4572703, at *10 (S.D.N.Y. Sept. 20, 2019); *Bonilla v. Iowa Bd. of Parole*, 930 N.W. 2d 751, 777 (Iowa 2019); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015); *Maryland Restorative Justice Initiative v. Hogan*, No. 16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017))

*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979); *Swarthout v. Cooke*, 562 U.S. 216 (2011).[21]

Since Plaintiffs have a constitutionally protected liberty interest in a meaningful parole review, they are entitled to the minimal procedural protections outlined by the Supreme Court in *Morrisey*. D.E.104 at 29, fn 91. Defendants' parole process fails to meet even the most basic requirement that individuals have an opportunity to be heard.  It is an undisputed material fact that Plaintiffs may not attend their parole hearings and do not speak to Defendants as part of the parole process.  SOF 26-27. It is also undisputed that there is no right to counsel and no opportunity to cross-examine or rebut statements made by others during the hearing. SOF 28. Additionally, only a boilerplate Commission action form is provided after the hearing that does not include all of the information Defendants rely on. SOF, 9-10, 26.

The protections Defendants highlight do nothing to cure these procedural defects. Defendants note that anyone can attend a meeting and advocate on the inmate's behalf, D.E.96 at 26, but this right is severely restricted by the fact that each side generally has a total of ten minutes to speak.[22] D.E. 104, SOF 30. Defendants highlight Plaintiffs' right to appeal the decision back to the same body. D.E.96 at 26; § 947.173. Defendants argue that Plaintiffs can submit a rebuttal to

---

[21] *But see Brown*, 2022 WL 3725235 at *7 (finding contrary to the majority of cases that JLWPs do not have a cognizable liberty interest in a meaningful opportunity for release to parole.)
[22] Indeed, the sheer volume of hearings a day prevents a lengthy review. D.E. 104, SOF 31

the Commission, D.E. 96 at 8, overlooking that Plaintiffs are not provided the information they may need to rebut. SOF 23-26.

Defendants also argue that there is no procedural due process violation because state alternatives are available. D.E. 96 at 27. But Defendants' argument and cases miss the point, which is that Plaintiffs cannot otherwise challenge Defendants' policies, practices, and procedures, -- *i.e.*, systemic failures – they can only challenge individual decisions. Plaintiffs are entitled to bring a due process challenge to an "established state procedure." *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *Fetner v. City of Roanoke*, 813 F.2d 1183, 1186 (11th Cir. 1987); *See also Zinermon v. Burch*, 494 U.S. 113, 138-39 (1990) (holding that since the deprivation of a liberty interest was foreseeable, state officials charged with implementing procedural safeguards could be liable under § 1983).[23]

In any case, Florida's processes do not provide an "adequate remedy" for Plaintiffs.[24] The vehicle for challenging a PPRD in Florida courts is a writ of mandamus. *See Griffith v. Florida Parole and Probation Commission*, 495 So.2d 818, 820 (Fla. 1986); *Young v. Florida Commission on Offender Review*, 225 So.3d 940, 941-42 (Fla. 5th DCA 2017). Mandamus is a narrow remedy designed to "compel a public officer to perform a duty." *Johnson v. Florida Parole*

---

[23] Like in *Fetner*, it is certainly practicable for Florida to provide additional procedures to protect inmates' liberty interest in a meaningful parole review.

[24] To the extent that Defendants argue Plaintiffs should have first tried their claims in state court, this misunderstands the law. *See Horton v. Board of County Commissioners of Flagler County*, 203 F.3d 1297, 1300 (11th Cir. 2000).

*Commission*, 841 So.2d 615, 617 (Fla. 1st DCA 2003).  This kind of review – which allows inmates to challenge their individual parole decisions – is wholly inadequate to obtain the systemic relief Plaintiffs seek.[25] At this review, the circuit court determines if the reasons provided by the Commission are "facially valid, supported by the record, and authorized by statute and rule." B*arreiro v. Florida Commission on Offender Review*, 164 So.3d 1249, 1251 (Fla. 1st DCA 2015). Importantly, mandamus is not the proper remedy for a policy change that will affect future conduct. *See Stone v. Ward*, 752 So.2d 100 (Fla. 2nd DCA 2000).[26]

The other remedy – a re-review of Defendants' parole decisions – requires individuals to go back in front of the *same body* whose rules and procedures they seek to challenge. § 947.173; § 947.165. These remedies will not "correct whatever deficiencies exist" and "provide plaintiff with whatever process is due." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000).

## IV.   THE HECK DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS

As this Court has already held: "*Heck* does not bar plaintiffs' claims that Florida's parole system denies them a meaningful opportunity for release in

---

[25] In *Clifford v. Florida Commission on Offender Review*, 342 So.3d 706, 708 (Fla. 1st DCA 2022), the court held that Clifford could not challenge his original PPRD because he filed his complaint after more than one year from when it was set. Such limitations on the scope of mandamus review would undermine the ability to effectively challenge Defendants' parole policies, procedures, and practices.

[26] An individual may only challenge the denial of a writ of mandamus through the "limited" writ of certiorari. *See Sheley v. Florida Parole Commission*, 720 So.2d 216, 217 (Fla. 1998). At this review, the only question is whether the circuit court afforded "due process and observed the essential requirements of law." *See Spaziano v. Florida Parole Commission*, 46 So.3d 576 (Fla. 1st DCA 2006). This limited review similarly does not provide an avenue to challenge Defendant's underlying policies and practices.

violation of their constitutional rights." D.E. 43 at 8. Under *Heck v. Humphrey*, otherwise valid claims brought pursuant to 42 U.S.C. § 1983 are only unavailable to prisoners if they "necessarily imply the invalidity of [a] ... conviction or sentence." 512 U.S. 477, 487 (1994); *see also Hill v. Snyder*, 878 F.3d 193, 207 (6th Cir. 2017) ("[The] word 'necessarily' must not be ignored – if invalidation of a conviction or speedier release would not automatically flow from success on the § 1983 claim, then the *Heck* doctrine is inapplicable.").

Here, Plaintiffs do not contend that their convictions or sentences are invalid or unconstitutional. Rather, they assert Florida's parole system, processes, and procedures deny them a meaningful opportunity for release upon demonstrated maturity and rehabilitation that the Constitution requires. Plaintiffs seek relief either pursuant to the 2014 Juvenile Sentencing statute, which would require a judicial hearing to determine if early release is appropriate, or a parole system that has been modified to specifically account for their demonstrated maturity and rehabilitation, their youth at the time of the original offense, and to provide other necessary procedural protections to that end. Under either form of relief, Plaintiffs may secure an earlier release, but such release would not be guaranteed.

## CONCLUSION

For the foregoing reasons Plaintiffs ask that this Court deny Defendants Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Dated: September 22, 2022.

**JUVENILE LAW CENTER**
1800 John F. Kennedy Blvd.
Suite 1900B
Philadelphia, Pennsylvania 19103
Telephone: 215-625-0551

Marsha Levick (admitted *pro hac vice*)
*mlevick@jlc.org*
Andrew Keats (admitted *pro hac vice*)
*akeats@jlc.org*
Monica Disare (admitted *pro hac vice*)
*mdisare@jlc.org*

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: 305-374-8500

/s/ Tracy Nichols
Tracy Nichols (FBN 454567)
*tracy.nichols@hklaw.com*
Stephen P. Warren (FBN 788171)
*stephen.warren@hklaw.com*

**HOLLAND & KNIGHT LLP**
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: (904) 353-2000
Fax: (904) 358-1872

Laura B. Renstrom (FBN 108019)
*laura.renstrom@hklaw.com*

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 22, 2022, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/Tracy Nichols*

Tracy Nichols