## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ROBERT EARL HOWARD,
DAMON PETERSON, CARL
TRACY BROWN and WILLIE
WATTS,**

        **Plaintiffs,**

**v.**                                 **Case No: 6:21-cv-62-PGB-EJK**

**MELINDA N. COONROD,
RICHARD D. DAVISON and
DAVID A. WYANT,**

        **Defendants.**
                   /

## ORDER

This cause comes before the Court on the following:

1.    Defendants Melinda N. Coonrod, Richard D. Davison, and David A. Wyant's (the "**Commissioner Defendants**") Motion for Summary Judgment (Doc. 96), Plaintiffs Robert Earl Howard, Willie Watts, Damon Peterson, and Carl Tracy Brown's (the "**Named Plaintiffs**")[1] response in opposition (Doc. 108), and the Commissioner Defendants' reply thereto (Doc. 110); and

---

[1]  The Court will not consider information specifically related to Named Plaintiff Willie Watts as the Commissioner Defendants assert he is no longer a member of the Class. (Doc. 112, p. 19). More importantly, this factual assertion went undisputed in Plaintiff's relevant reply. (Doc. 114).

2.    The Named Plaintiffs' Amended Motion for Summary Judgment (Doc. 104), the Commissioner Defendants' response in opposition (Doc. 112), and the Named Plaintiffs' reply thereto (Doc. 114).

Upon consideration, the Commissioner Defendants' Motion for Summary Judgment is due to be granted.[2]

## I.    BACKGROUND

### A.    Procedural Background

This class action dispute stems from a constitutional challenge to Florida's parole procedures for juveniles sentenced for life, or a sentence tantamount to life, with the possibility of parole. The Named Plaintiffs—along with about 170 other individuals (the "**Class Members**")—are incarcerated in the state of Florida, serving life sentences with the possibility of parole for crimes committed when they were under the age of eighteen years old. (Doc. 113, ¶ 45).[3] The Eighth Amendment to the United States Constitution mandates that those juveniles who commit crimes when they are under eighteen be sentenced by someone with discretion to consider the mitigating qualities of youth and that states affirmatively afford juveniles serving life sentences a "meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48

---

[2]   Plaintiffs' Motion for Summary Judgment (Doc. 104) is accordingly due to be denied as moot.

[3]   Following decisions by the Florida Supreme Court, a number of juveniles sentenced to life with the possibility of parole who would have otherwise been Class Members received resentencing hearings and a number were released. (Doc. 113, ¶ 46).

(2010); *Miller v. Alabama*, 567 U.S. 460 (2012) (noting that life without parole sentences for juvenile homicide offenders are only conditionally permissible).

In response to this line of Supreme Court cases, Florida adopted in 2014 new sentencing procedures for juvenile offenders serving life in prison without the possibility of parole. FLA. STAT. § 921.1401. The 2014 Juvenile Sentencing Statute requires an individualized sentencing hearing to consider the offense committed along with the defendant's youth before imposing a life sentence. *See* FLA. STAT. § 921.1401; (Doc. 1, ¶ 6). The Named Plaintiffs allege, however, that Florida has not yet fully remediated its parole review procedures to comply with the Eighth and Fourteenth Amendments to the United States Constitution. (*Id.* ¶¶ 4, 7–8). In particular, the Named Plaintiffs allege that the juveniles serving life *with* parole sentences "are not being afforded the right to meaningful opportunity for release now required by the Constitution." (*Id.*).  Instead, the Named Plaintiffs allege that juveniles sentenced to life *with* parole may only be released "in accordance with the limited process set forth in Florida's parole statutes" which is administered by the Florida Commission on Offender Review ("**FCOR**") and is "virtually identical for adult and juvenile offenders." (*Id.* ¶ 8). Thus, the Named Plaintiffs allege that "Florida's parole system . . . directly contradicts the mandates of the U.S. Supreme Court cases that establish that juvenile lifers have a constitutional right to be released from prison upon demonstration of maturity and rehabilitation." (*Id.* ¶ 8).

Consequently, the Named Plaintiffs, on behalf of themselves and all others similarly situated, filed a five-count Complaint against the FCOR Commissioner Defendants in their official capacity, but the Court dismissed the Equal Protection and Sixth Amendment counts for failure to state a claim. (Docs. 1, 43). The case proceeds on an Eighth Amendment claim pursuant to 42 U.S.C. § 1983, a Procedural Due Process Fourteenth Amendment claim pursuant to § 1983, and a declaratory judgment claim. (Doc. 43). The Court later certified a Rule 23(b)(2) class defined as follows:

> All persons who (i) were convicted of a crime committed when they were under the age of eighteen; (ii) were sentenced to life in prison or a term of years exceeding their life expectancy (defined as greater than 470 months); (iii) are currently in the custody of the Florida Department of Corrections; (iv) have never been paroled; and (v) are or will become eligible for release to parole supervision but only through the parole process.

(Doc. 58, pp. 5–6 (the "**Class**")).[4]

After discovery, both Plaintiffs and the Commissioner Defendants submitted motions for summary judgment (Docs. 96, 104), response briefs in opposition (Docs. 108, 112), and corresponding replies in support (Docs. 110, 114). Consequently, this matter is ripe for review.

---

[4] Upon certifying the Class, the Court noted that "the bulk of Defendants' response" amounted to a contention that Plaintiffs will fail on the factual merits of the case. (Doc. 58, pp. 6). The Commissioner Defendants there argued that the state of Florida's parole system applicable to the Class already provides Plaintiffs "some meaningful opportunity" for early release, adequate procedural protections, and an individualized showing of current maturity and rehabilitation. (Docs. 52, 58). The Court noted these merits arguments were inappropriate at the class certification stage but that it would consider them at the proper procedural juncture. (Doc. 58). That juncture has now arrived.

### B.    Factual Background[5]

#### 1.    FCOR Parole Procedures

The Defendants serve as Commissioners of the FCOR: Melinda N. Coonrod as Chair, Richard D. Davison as Vice Chair, and David A. Wyant as Secretary. (Doc. 96, p. 2). The FCOR and Commissioner Defendants' operational imperative is set by statute and regulated by rule:

> No person shall be placed on parole until and unless the commission finds that there is reasonable probability that, if the person is placed on parole, he or she will live and conduct himself or herself as a respectable and law-abiding person and that the person's release will be compatible with his or her own welfare and the welfare of society.

FLA. STAT. § 947.18; *see generally* FLA. ADMIN. CODE 23-21.

For all parole eligible inmates within the jurisdiction of the FCOR, there are four stages in the parole process. (Doc. 113, ¶ 2). First, there is an Initial Interview to establish a potential parole date. (*Id.*). This potential parole date can be set in the future or the past; if set in the past, inmates immediately receive an effective parole release date—the actual scheduled parole date barring setbacks. (*Id.*). Second, Subsequent Interviews take place at intervals of up to seven years to update the potential parole date. (*Id.*). Third, an Effective Interview occurs near the expiration of the potential parole date to determine whether to authorize an effective parole release date. (*Id.*).  Fourth and finally, an Extraordinary Review may occur if necessary for the Commissioner Defendants to outline their reasoning

---

[5]   Unless indicated otherwise, the following facts are from either the parties' Joint Stipulation of Agreed Material Facts (Doc. 113) or other record evidence which is not reasonably in dispute.

behind any given decision if the FCOR declined to authorize parole. (*Id.*). Additionally, the potential exists for a Special Interview providing additional review upon request if special circumstances emerge. (*Id.*).

For all types of FCOR interviews, the process for Class Members is the same as for adult offenders, with the exception of the use of a Youthful Offender Matrix applied after 2014 at Initial Interviews and some Subsequent and/or Special Interviews. (*Id.* ¶¶ 2, 17, 20). However, the FCOR has not modified its existing manuals or training of investigators and staff to educate them on why children are different than adults. (*Id.* ¶ 38). Nevertheless, the Commissioner Defendants all testified that they consider factors relating to youth when setting or modifying the potential parole date and that FCOR rules provide for the Commissioner Defendants to discretionarily do so, even while there is nothing in these rules, policies or manuals that require this. (*Id.* ¶ 39). The Youthful Offender Matrix makes across the board guideline recommendations of dramatically earlier potential parole dates. *Compare* FLA. ADMIN. CODE 23-21.009(5) *with* FLA. ADMIN. CODE 23-21.009(6); (Doc. 113, ¶ 39). By regulation, the Youthful Offender Matrix is "[t]o be used when the inmate is sentenced by the court under [the 2014 Youthful Offender Act], when the inmate is classified as a youthful offender by the Department of Corrections, or when the offender was less than eighteen years of age when the primary offense was committed for initial interviews conducted subsequent to the effective date of this rule." FLA. ADMIN. CODE 23-21.009(6) n.1.

As a general matter, the Commissioner Defendants do not meet with or speak to a Class Member throughout the parole process. (Doc. 113, ¶ 27). In addition, no counsel, mitigation experts, or psychologists are provided at state expense to Class Members to assist in the parole process. (*Id.* ¶ 28). However, Class Members are free to secure their own counsel or experts, either at their own expense or pro bono. (*Id.*). If a Class Member acquires counsel, that counsel is limited to ten minutes, unless extended by Commissioner Defendants, to speak at FCOR Meetings and neither side may cross-examine or rebut statements made by others. (*Id.* ¶ 29). Class Members can also access their files through a public records request. (*Id.* ¶ 14).

Upon incarceration, the Florida Department of Corrections makes available a Class Member's sentencing documents to FCOR staff who review them to determine the Initial Interview date such that the Initial Interview is held near the end of the mandatory minimum. (*Id.* ¶¶ 3, 10). On an Initial Interview or Subsequent Interview date, an assigned Investigator meets with the Class Member and interviews them after reviewing background information on the inmate—that is, all the official records available since sentencing pertaining to the inmate. (*See e.g.*, Doc. 96-1; Doc. 113, ¶¶ 2, 4). The interviews begin with an FCOR Investigator speaking with a classification officer at the prison and meeting with the Class Member. (Doc. 113, ¶ 21). The Investigator is the only required FCOR employee to ever meet with a Class Member with respect to the parole process. (*Id.*).

The Investigator then prepares a preliminary Salient Factor score, which is an "indices of the offenders' present and prior criminal behavior and related factors found by experience to be predictive in regard to parole outcomes." (*Id.* ¶ 5). The total Salient Factor score includes individual point values for (1) prior convictions, (2) prior incarcerations, (3) years sentenced, (4) parole, probation, and other revocations, (5) prior escape and attempt conviction, and (6) whether burglary, breaking and entering, or robbery are part of the conviction—all scored at zero, one, or two. (*Id.* ¶ 6). Potential parole dates are then calculated by determining where the Salient Factor score and the severity of the offense behavior intersect in a matrix. (*Id.* ¶ 11). From that matrix, a number of months until the potential parole date is established. (*Id.*).

During the Initial Interview, the Investigator explains to the inmate they are at an Initial Interview, the Salient Factor scoring process, and the Investigator's preliminary Salient Factor score recommendation so that the inmate has an opportunity to dispute any potential errors. (*Id.* ¶ 7). In addition, the Investigator orally discusses with the inmate the recommendation he intends to convey to the Commissioner Defendants on setting or amending the potential parole date after which the inmate signs an acknowledgement of the interview. (*Id.* ¶ 22). In other words, Class Members are informed how the initial offense, Salient Factor score, mitigations, and aggravations are used alongside the applicable matrix to arrive at the potential parole date recommendation. (*Id.* ¶ 8). At the same time, the primary avenue for a Class Member to know what information is being submitted to the

Defendants is by making a public records request. (*Id.* ¶ 24). Costs vary for requests from being free to costing $0.15 per page, unless extraordinary circumstances not relevant here apply. (*Id.*).

FCOR Investigators then report the recommended potential parole date to the Commissioner Defendants along with a rationale.  (*Id.* ¶ 12). However, these recommendations are not binding on the Commissioner Defendants. (*Id.*). In other words, the Commissioner Defendants may set a potential parole date outside the matrix guideline based on consideration of persuasive evidence relevant to a non-exclusive list of aggravators and mitigators. (*Id.* ¶¶ 11, 40). This expressly includes the following as a mitigating factor: "The inmate committing the crime was of such a young age as to diminish his capacity to fully understand the seriousness of his action and its direct consequences." FLA. ADMIN. CODE. 23-21.010.

The Commissioner Defendants make these decisions at meetings open to the public. (Doc. 96-1, 92:8–9).  In order to make these adjustments, the Commissioner Defendants also receive information leading up to and during the FCOR Meeting, including from those associated with the Class Members, before making their potential parole date and parole decisions. (Doc. 113, ¶¶ 14, 25). For example, the Commissioner Defendants have access to information that Investigators do not, including autopsy reports, pre-sentencing investigation reports, trial transcripts, police reports, processed disciplinary records during incarceration, and communications from citizens to the FCOR. (*Id.* ¶¶ 41, 44). This ability to render a parole date decision above or beyond the recommended matrix

guideline extends after the Initial Interview as the Commissioner Defendants have the ability to reduce or extend a potential parole date at Subsequent Interviews based on new information. (*Id.* ¶ 42). The Commissioner Defendants deliberate individually prior to FCOR Meetings based on the information received from all relevant parties but can only discuss a case collectively with each other at their publicly noticed FCOR Meetings. (*Id.* ¶ 30).

Furthermore, if a Class Member obtained counsel, that counsel can advocate for their client for the ten-minute allotment with the potential for a discretionary extension at these FCOR Meetings. (*Id.* ¶¶ 14, 29). However, Class Members are not themselves allowed to attend those FCOR Meetings either in person, by phone, or by video. (*Id.* ¶ 26).  In the end, the Investigator's potential parole date rationale is often the primary narrative prepared by an FCOR employee describing the underlying offense and the Class Member's institutional conduct and program participation. (*Id.* ¶ 22). However, additional FCOR Investigators may be assigned to produce more narrative information for the Commissioner Defendants upon request. (*Id.* ¶ 22).

Commissioner Defendants' final potential parole date decisions at FCOR Meetings are recorded on a standard form. (*See e.g.*, Doc. 104-16; Doc. 113, ¶ 15). Thereon, the Commissioner Defendants are required to state the number of months based on the matrix and any additional months based on aggravating or mitigating factors that lead to the potential parole date decision. (Doc. 113, ¶ 15). In calculating the potential parole date, the parole rules do not mandate treating

Class Members differently from adult offenders beyond the use of the now-required Youthful Offender Matrix and the enumeration of the potential mitigating factor related to age. (*Id.* ¶ 16). Indeed, prior to 2014, the Commissioner Defendants used the same matrix for both adult and juvenile offenders. (*Id.* ¶ 17). In addition, prior to 2014 the Salient Factor score contained a provision wherein a juvenile offender was pointed for his age at the time of the offense such that two additional points were added for juvenile offenders that could add up to five more years to the initial potential parole date, although this calculation was and is subject to a later potential modification in the process. (*Id.*). In 2014, the extra Salient Factor consideration was removed, concurrent with the introduction of the Youthful Offender Matrix. (*Id.*). While the Commissioner Defendants never uniformly and retroactively applied the Youthful Offender Matrix to change the potential parole dates for those Class Members who underwent their Initial Interview and potential parole date determination under the pre-2014 matrix, the Youthful Offender Matrix is now available for use at Special Interviews and Subsequent Interviews (which can occur no more than seven years after a prior interview). (Doc. 104-5, 24:14–23; Doc. 113, ¶¶ 2, 19). Around ninety-three Class Members' initial potential parole dates were not set using the Youthful Offender Matrix as their Initial Interview occurred prior to 2014. (Doc. 104, p. 5).

The Commissioner Defendants generally hold FCOR Meetings weekly and consider over 200 cases in each meeting, of which about twenty to forty relate to parole interviews. (Doc. 113, ¶ 31). The Commissioner Defendants review the entire

file for each parole case prior to the Commission Meeting. (*Id.* ¶ 32). Meeting reviews can take hours. (*Id.*). At times, however, the discussion among the Commissioner Defendants in setting the potential parole date can last only a few minutes. (*Id.* ¶ 33).

After the FCOR Meetings, the only recording of these meetings is made on a CD which is not available to a Class Member because it is considered prison contraband. (*Id.* ¶ 26). Any person may request a CD recording of a Class Member's FCOR meeting. (*Id.*). If the recording is understandable, that person could later summarize or describe the meeting to the Class Member. (*Id.*). The Class Member may also have a person in the prison administration receive the CD and play it for them, but this is not required of prison administration and the practice varies. (*Id.*).

If individual Class Members seek to challenge the Commissioner Defendants' compliance with FCOR rules and procedure, they may seek judicial review of the Commissioner Defendants' determinations regarding potential parole dates and effective parole dates. (*Id.* ¶ 13). Generally, this takes the form of mandamus appellate review, though effective parole release dates are reviewed under habeas. (*Id.*).

### 2.    *Other Relevant FCOR Parole Data*

From a 30,000-foot view, there is a variance over time in the sentence structures of Class Members and similarly in how the parole system interacts with them. (*Id.* ¶ 1). This variance is the result of, among other factors, various

conviction rates across decades, different sentencing schemes, changes in parole status, and amendments to the parole system. (*Id.*).

No new members have been added to the Class whose offenses were after 1994 due to statutory changes. (*Id.* ¶ 43). That is, Florida abolished parole for first degree murder offenses occurring on or after May 25, 1994. (*Id.*). Prior to this point, only two possible penalties for juvenile offenders convicted of capital murder: the death penalty or life with the possibility of parole after a minimum of twenty-five years. FLA. STAT. § 775.082 (1994).

However, some juvenile offenders who were incarcerated before 1994 have been released or otherwise removed from the pool of potential class members; FCOR has historically paroled over 246 individuals who would otherwise be eligible for class treatment, although since *Miller* was decided in 2012, the Commissioner Defendants have only paroled at least twenty-three juveniles sentenced to life with the possibility of parole who would otherwise be members of the class. (*See* Doc. 96-3; Doc. 104, p. 15; Doc. 113, ¶¶ 43, 45). Of note, however, in its 2016 *Atwell* decision the Florida Supreme Court determined that the 2014 Juvenile Sentencing Statute should also apply to juveniles sentenced for life with the possibility of parole. *Atwell v. State*, 197 So. 3d 1040, 1050 (Fla. 2016).  Two years later, the so-called *Atwell* Window closed when the Florida Supreme Court reversed itself. *See State v. Michel*, 257 So. 3d 3 (Fla. 2018); *Franklin v. State*, 258

13

So. 3d 1239 (Fla. 2018).[6] During the *Atwell* Window, many of those juveniles sentenced for life with the possibility of parole who otherwise would have been Class Members filed petitions for resentencing. (Doc. 104-22). Of the 125 applicable cases that were heard and decided during the *Atwell* Window, ninety-eight of them were released (or seventy-eight percent), six were given a delayed release, and only three were resentenced to life sentences. (Doc. 104, p. 16).

Finally, the Commissioner Defendants produced documentation demonstrating several instances where they amended potential parole dates downward for Class Members (or for individuals who would otherwise be eligible for class treatment if they had not been paroled).[7] (Doc. 96-1).

### 3.    The Named Plaintiffs

The Named Plaintiffs are all at various stages of the FCOR parole process. Plaintiff Robert Earl Howard ("**Plaintiff Howard**") is serving a life term with the possibility of parole due to a murder and burglary that he committed when he was seventeen. *Howard v. State*, 180 So.3d 1135 (2015). He has had three subsequent interviews since his potential parole date was set for 2062 in 2005 after the Commissioner Defendants rejected the FCOR Investigator's recommendation to set it for 2015 by considering other aggravating factors. (Doc. 104-8). Plaintiff

---

[6]   In a prior Order, the Court distinguished these cases by noting that "[t]he Courts finds the Defendants' use of this case misplaced because the Florida Supreme Court was not tasked with determining whether Florida's parole system actually does provide inmates with the required meaningful opportunity for release" or "whether the parole system is fundamentally flawed." (Doc. 43, p. 14 nn.8–9).

[7]   Those who have left prison for any other reason prior to this lawsuit are not Class Members. (Doc. 113, ¶ 43).

Howard has completed his GED, participated in over eighteen voluntary programs, received above satisfactory work ratings, and had not received a disciplinary report in over thirty-five years as of 2018. *Howard*, 180 So.3d at 1135. Beginning in 2010, his classification officer provided materials to the FCOR recommending he be paroled. (Doc. 104-17). Although subject to periodic revision, Plaintiff Howard will be ninety-one upon the arrival of his current parole release date. (*See* Doc. 104-8).

Plaintiff Damon Peterson ("**Plaintiff Peterson**") was sentenced for first-degree murder, along with other separate offenses, committed when he was a minor. (Doc. 104-16). The Investigator in his case recommended a potential parole date in 2027, but the Commissioner Defendants set the date instead for 2060. (*Id*.). The increase was due to aggravating factors related to the underlying offense and for unsatisfactory institutional conduct, but no evidence of discussion between the Commissioner Defendants related to mitigating factors is present on the official FCOR record for the meeting in question. (*Id*). Finally, the FCOR Commissioner Meeting following Plaintiff Carl Tracy Brown's ("**Plaintiff Brown**") Initial Interview lasted less than five minutes, and there was no discussion of his age at the time of his offense or his disciplinary record in prison (or lack thereof). (*See* Doc. 104-10, 79:13–84:15).

## II.   STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v.*

15

*Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

After a thorough review of the record, the Court agrees with both parties that no dispute of material fact remains and the issues in the case are now "legal issues for the Court to decide." (Doc. 119, p. 7). Under this record, the Court holds the undisputed evidence demonstrates Florida's parole procedures as enacted through

the practices and policies of the FCOR by the Commissioner Defendants are adequate under the Fourteenth Amendment's Due Process Clause and the Eighth Amendment's prohibition against cruel and unusual punishment.[8] As laid out in the findings of fact, the FCOR's parole procedures provide Class Members a meaningful opportunity for release based on a consideration of demonstrated maturity and rehabilitation.[9] While the national mood may be shifting away from a heavily punitive approach to criminal justice, the Court's role is not to concretize this mood into law. To do so would usurp the Florida legislature's duty to set criminal and penological policy for the state and bypass individualized remedies available to individualized Class Members. Instead, the Court must ensure that Florida's parole system as enacted by the FCOR meets the irreducible constitutional floor. With respect to the Class, it has done so here.[10] Accordingly, the Commissioner Defendants' Motion for Summary Judgment is granted.

---

[8] As a necessary consequence, the Named Plaintiff's request for declaratory judgment also fails. (Doc. 1, ¶¶ 175–176).

[9] As the Court rules in favor of Defendants based on the record, it will assume without deciding that Defendants are not here entitled to quasi-judicial immunity when sued in their official capacities. (Doc. 96, p. 11). Moreover, the Court will further assume without deciding that the plain text of 42 U.S.C. § 1983 does not bar injunctive or declaratory relief against the Commissioner Defendants. (*Id.* at pp. 10–11). Finally, the Court notes that it has already addressed and cast aside Defendants' objection that the *Heck* doctrine bars the Named Plaintiffs' claims. (Doc. 43, pp. 6–8; Doc. 96, p. 29).

[10] As the Court noted upon certification of the class, "the heart of Plaintiffs' case is that Florida's procedural protections for juveniles sentenced to life with parole are wholly inadequate under the Eighth and Fourteenth Amendments." (Doc. 58, p. 12). While class relief ultimately is not appropriate here, the Court takes no position on whether the procedural mechanisms in question have been properly applied to any given Class Member; if a Class Member believes a violation has occurred, other individualized remedies are available for them to seek on an individualized basis. (Doc. 113, ¶ 113).

### A.   Eighth Amendment Claim

The Eighth Amendment prohibits the infliction of cruel and unusual punishments. U.S. CONST. amend. VIII.  Contained in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349 (1910). Certain punishments of offenders who committed their crimes when they were juveniles qualify as disproportionate. *Roper v. Simmons*, 543 U.S. 551 (2005) (holding the Eighth Amendment forbids capital punishment for offenders who were juveniles at the time of their capital crimes).  With respect to juvenile offenders who commit crimes when they are under eighteen sentenced for life, the Eighth Amendment further requires they be sentenced by someone with discretion to consider the mitigating qualities of youth and to thereby sometimes impose a lesser punishment, *Miller*, 567 U.S. 460 (2012) (noting that life without parole sentences for juvenile homicide offenders is conditionally permissible). As part of this process, states must affirmatively afford juvenile offenders who commit crimes when they are under eighteen a "meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48 (2010); *Montgomery v. Louisiana*, 577 U.S. 190, 208–09 (2016) (finding these new substantive constitutional rules are retroactive); *Jones v. Mississippi*, 141 S. Ct. 1307, 1314–15 (2021) (limiting the *Graham* line of cases by holding that a factual finding of permanent incorrigibility is not required to sentence offenders who committed crimes as juveniles, only that the mitigating qualities of youth be

considered). At bottom, the Named Plaintiffs contend that the FCOR, through the Commissioner Defendants, has failed to adhere to this Eighth Amendment proscription and thus made Florida's parole system a cruel and unusual punishment with respect to the Class. (Docs. 104, 108). The Court ultimately disagrees.

At the outset, the Court notes it agrees with other courts that "the constitutional protections recognized by *Graham*, *Miller*, *and Montgomery* apply to parole proceedings for juvenile offenders serving" imprisonment for life because the same logic applies with equal force even though the line of cases following *Graham* primarily dealt with sentencing. *See Flores v. Stanford*, 18cv2468, 2019 WL 4572703, at *8 (S.D.N.Y. Sept. 20, 2019). This is a necessary extension of the Supreme Court's recognition in *Montgomery* that while "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole," the parole process must be one that "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence." 577 U.S. at 211.

The Court likewise rejects the Commissioner Defendants' argument that the Class Members are in reality challenging their sentence. (Doc. 96, pp. 13–17). Instead, the Class Members are arguing their sentences should mean what they say: imprisonment for life *with the possibility of parole*. (Doc. 104, pp. 18–22) (emphasis added). Since they were sentenced as juveniles, Class Members argue this *possibility of parole* constitutionally entails meaningful procedural

19

consideration of their potential maturity and rehabilitation in light of their youth when their crimes were committed. (Doc. 108, p. 7). Necessarily so; in fact, even the Commissioner Defendants agree that the opportunity for parole release for Class Members "cannot be utterly illusory." (Doc. 96, p. 24).

Afterall, the "foundation stone" for *Miller*'s analysis was the line of precedent holding certain punishments disproportionate when applied to juveniles. 567 U.S. at 470 n.4. Relying on *Roper* and *Graham*, *Miller* recognized that children differ from adults in their "diminished culpability and greater prospects for reform," and that these distinctions "diminish the penological justifications" for imposing life without parole on juvenile offenders. 567 U.S. at 471–72. Because *Miller* determined that sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption," it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—*i.e.*, juvenile offenders whose crimes reflect the immaturity of youth. 567 U.S. at 479–80. *Montgomery* therefore posited that some juvenile offenders might face "a punishment that the law cannot impose upon [them]." 577 U.S. at 208–09 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004)). The same is true here. At bottom, parole systems must afford juveniles sentenced for life with the possibility of parole at least some minimally meaningful opportunity to demonstrate the gravamen of this line of cases—that children who commit even heinous crimes are capable of material maturation and

change. *Montgomery*, 577 U.S. at 212. To find otherwise would be tantamount to creating an exception that swallows the rule.[11]

With that said, a thorough review of the undisputed record counsels a finding that the practices and policies of FCOR do provide Class Members some meaningful opportunity for release based on demonstrated maturity and rehabilitation as a matter of law. Mostly importantly, the Youthful Offender Matrix is available by regulation to set a lower baseline potential parole date for the Class Members in comparison with inmates who committed their offense as adults. *Compare* FLA. ADMIN. CODE 23-21.009(5) *with* FLA. ADMIN. CODE 23-21.009(6); *see also* FLA. ADMIN. CODE 23-21.009(6) n.1; (Doc. 113, ¶ 39). While the Youthful Offender Matrix has not yet been uniformly and retroactively applied to the Class Members, it is available for use in Special Interviews or Subsequent Interviews, which must occur at least every seven years to revisit the potential parole date.[12] (Doc. 104-5, 24:14–23; Doc. 113, ¶¶ 2, 17, 19, 20).  Moreover, this consideration is not a sham. The Commissioner Defendants have put forward some record instances where they have adjusted current Class Member's potential parole dates downward based on demonstrated maturation and rehabilitation, and FCOR has

---

[11]   The Court notes that it read and reviewed the persuasive authority the Commissioner Defendants cite in opposition on this issue but finds that those cases read *Graham* and its progeny far too formalistically and narrowly for the Court to adhere to their guidance. (Doc. 96, p. 12).

[12]   The Class Members who have not yet had the Youthful Offender Matrix applied to calculate their recommended potential parole date even their next Subsequent or Special Interview may have a strong individual appeal, but this individualized issue is not currently before the Court.

paroled at least 246 individuals who would otherwise be eligible for class treatment, twenty-three of which have been paroled since 2012. (Doc. 96-1; Doc. 96-3; Doc. 104, p. 15; Doc. 113, ¶¶ 43, 45).

The Named Plaintiffs repeatedly argue that records of the Commissioner Defendants' Meetings frequently show a focus on a Class Member's underlying offense much more than their progress towards rehabilitation, but the Court notes that consideration of the seriousness of an offense does not foreclose that the Commissioner Defendants also consider demonstrated signs of maturity and rehabilitation. (Doc. 104, pp. 3, 9, 12, 19). Instead, as in sentencing, parole is not a one-size-fits-all process, and it necessarily must take into the account the seriousness of the particular offense(s) in question in order to gauge maturation and rehabilitation from that baseline. *See Jones*, 141 S. Ct. at 1314–15 (noting that when sentencing those offenders who committed crimes as juveniles the mitigating qualities of youth must be considered but only as part of a total mix of factors).

Furthermore, while raw parole numbers, parole release percentages, and average projected age upon release may provide some helpful context for resolving this inquiry, alone they do not settle the issue, particularly in light of the *Atwell* Window. (*See* Doc. 104, p. 15). The Named Plaintiffs seize upon the marked disparity between the FCOR parole release data since 2012 and the data for those juveniles sentenced for life with the possibility of parole but then resentenced during the *Atwell* Window. (*Id.* at pp. 15–16). But this data might cut the other way—that is, how is the Court to know whether the population most likely to be

22

paroled due to their ability to demonstrate maturation and rehabilitation were not the ones released during the *Atwell* Window? In other words, it is possible that the deflated parole release data over the last few years is due in part to a sampling error brought about by *Atwell*. This is not to say this is definitively the case, only that the data alone does not tell the whole story.

Similarly, the idiosyncratic treatment of the individual Named Plaintiffs cannot carry the day by itself since the issue before the Court is the sufficiency of the entire parole process. (Doc. 104, p. 14). To that end, more descriptive rationales for parole date decisions at the FCOR Meetings and in related documentation would probably be beneficial, but the Court cannot say the rationales given in the record as a whole show an altogether lack of consideration of Class Members' demonstrated maturation and rehabilitation, particularly when the Commissioner Defendants attest they consider these factors, they have demonstrated their application from time to time, and their consideration is provided for by Rule. FLA. ADMIN. CODE. 23-21.010; (Doc. 96-1; *see* Doc. 96-4; Doc. 113, ¶ 39). Likewise, the particular length of any given Commission Meeting does not demonstrate the FCOR parole procedures are completely deficient when their duration is highly variable, and the Commissioner Defendants spend time beforehand weighing aggravating and mitigating factors individually. (Doc. 113, ¶¶ 1, 30, 32–33).

At bottom, the FCOR process as a whole meets at least the constitutional floor for Class Members to have a meaningful opportunity for release based on maturity and rehabilitation.

**B.      Fourteenth Amendment Procedural Due Process**

A due process claim requires three elements: (1) the deprivation of a constitutionally protected liberty interest; (2) state action; and (3) constitutionally inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). State action is not at issue here, so the Court addresses the liberty interest and adequacy of process issues in turn.

Importantly, "juvenile offenders serving a maximum term of life have a cognizable liberty interest in obtaining parole upon demonstrating maturity and rehabilitation." *Flores*, 2019 WL 4572703, at *10. "[A]lthough *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a mere hope of parole, it creates a categorical entitlement to demonstrate maturity and reform, to show that he is fit to rejoin society, and to have a meaningful opportunity for release." *Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015) (emphasis in original) (citing *Graham*, 560 U.S. at 75 ("It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life.")). This is not to say that there is a "right under the Federal Constitution to be conditionally *released* before the expiration of a valid sentence," *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (emphasis added), but instead that these Supreme Court cases "confer on juvenile offenders a constitutionally protected liberty interest in meaningful parole *review.*" *Flores*, 2019 WL 4572703,

at *10 (internal quotation marks and citation omitted) (emphasis added). At the same time, the Court is mindful that "[w]hen a new substantive rule of constitutional law is established, [the Supreme] Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *Montgomery*, 577 U.S. at 211.  As such, the Court proceeds to consider whether the FCOR's procedures are constitutionally adequate so as to ensure Class Members receive such a meaningful review.

The inquiry thus becomes what process is due. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). With the finding that Plaintiffs have a meaningful opportunity to demonstrate their maturity and rehabilitation as prescribed by FCOR rules and regulations under the Eighth Amendment, however, the concomitant availability of state remedies to ensure compliance with these rules and regulations on an individualized basis ensures the process available to the Class is adequate to protect their liberty interest.[13] *See Ogburia v. Cleveland*, 380 F. App'x. 927, 929 (11th Cir. 2010) (finding "procedural due process violations do not even exist unless no adequate state remedies are available") (quoting *Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000)); *see also Narey v. Dean*, 32 F.3d 1521, 1527 (11th Cir. 1994) (appeal to state superior courts with the power to "reverse the

---

[13] The Court allowed this challenge to proceed because the Named Plaintiffs alleged in effect the process provided was wholly inadequate from the outset such that the state of Florida through the FCOR had essentially refused to provide due process. *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)); (*see* Docs. 1, 43). The undisputed record shows this not to be the case.

decision or order of the board" is often an adequate procedural remedy under the circumstances); (Doc. 113, ¶ 13). While additional post-conviction counsel, the opportunity for Class Members to be present at FCOR Meetings, and mandatory provision of free records related to these proceedings (among other procedural protections) would likely be beneficial, this is not constitutionally required with the availability of state judicial review as a remedy. *Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009) (holding procedural due process does not always require the right to be heard before a decision is made regarding a constitutionally protected interest); *Watkins v. Israel*, 661 F. App'x. 608, 610 (noting a state's fiscal and administrative burdens in providing additional procedural guarantees may lessen due process requirements for some inmates); (Doc. 113, ¶¶ 13, 26–28). As the appeals remedies available to the Class ensure the FCOR procedures prescribed by law are not utterly illusory, there can be no procedural due process violation.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED** and **ADJUDGED** as follows:

1.   The Commissioner Defendants' Motion for Summary Judgment (Doc. 96) is **GRANTED**;

2.   The Named Plaintiffs' Motion for Summary Judgment (Doc. 104) is **DENIED**;

3.   The Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**;

4.      The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner Defendants and against Plaintiffs and to thereafter terminate any pending motions and close the file.

**DONE AND ORDERED** in Orlando, Florida on February 17, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

27