# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 15, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-10858-HH
Case Style:  Robert Howard, et al v. Melinda Coonrod, et al
District Court Docket No:  6:21-cv-00062-PGB-EJK

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing <u>must</u> include a Certificate of Interested Persons**. <u>See</u> 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10858

_____

ROBERT EARL HOWARD,
DAMON PETERSON,
CARL TRACY BROWN,
WILLIE WATTS,

Plaintiffs-Appellants,

*versus*

MELINDA N. COONROD,
RICHARD D. DAVISON,
DAVID A. WYANT,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-00062-PGB-EJK

_____

Before JILL PRYOR, NEWSOM, and LAGOA, Circuit Judges.

NEWSOM, Circuit Judge:

We must decide whether the parole system that applies to certain Florida inmates convicted of crimes committed while they were juveniles violates the United States Constitution. A certified class of incarcerated juvenile offenders—all sentenced to life in prison *with* the possibility of parole under a now-defunct sentencing scheme—sued the Commissioners of the Florida Commission on Offender Review. The district court granted summary judgment to the Commissioners. On appeal, the plaintiffs—whom we'll call the "juvenile lifers"—contend that the Commission is both subjecting them to cruel and unusual punishment in contravention of the Eighth Amendment and violating their rights to procedural due process under the Fourteenth Amendment. *See* U.S. Const. amends. VIII, XIV, § 1.

We hold that Florida's parole system does not—on a class-wide basis—violate either the Eighth Amendment's Cruel and Unusual Punishments Clause or the Fourteenth Amendment's Due Process Clause. The Commission might be a little stingy in granting inmates release from prison, but its system does not run afoul

of the Eighth Amendment.  And the juvenile lifers haven't identified any liberty interest that is cognizable for due-process purposes.

## I

## A

Florida's parole system comprises four stages.[1]

*First*, and most importantly, near the end of the mandatory-minimum portion of an inmate's sentence, the Florida Commission on Offender Review schedules an Initial Interview with the inmate and then sets a presumptive parole release date.  The Commission sets the presumptive release date based on a report prepared by an investigator, who actually meets with and evaluates the inmate.  The investigator proposes a release date based on two numbers: (1) a "salient factor" score, which incorporates various criminal-history components,[2] and (2) an "offense behavior" level, which is based on the crime of conviction's severity.  Under the Commission's regulations, the investigator plots the salient-factor score and offense-behavior level on a time-range matrix, which

---

[1] We base our description principally on Florida's parole regulations, the parties' Joint Stipulation of Agreed Material Facts, and the deposition of the Commission's Director of Field Services, Laura Tully.

[2] The salient-factor score is based on several considerations: (1) number of prior convictions; (2) number of prior incarcerations; (3) total time to which the offender has previously been sentenced; (4) number of parole and probation revocations; (5) number of escape or attempted escape convictions; and (6) whether burglary, breaking and entering, or robbery is the present offense of conviction.  *See* Fla. Admin. Code Ann. r. 23-21.007 (2025).

yields a guideline presumptive parole release date. *See* Fla. Admin. Code Ann. r. 23-21.009 (2025). Since 2014, the Commission has used two separate matrices—one for adult offenders and another for juveniles. *Id.* The "youthful offender matrix" produces substantially more generous guideline release dates than does the adult matrix. *See id.* Before 2014, investigators instead calculated juveniles' guideline release dates using the adult matrix, and parole regulations provided that an inmate's salient-factor score should *increase* if the inmate was a juvenile offender. *Id.* r. 23-21.007(4)(a) (2013).

The investigator recommends a parole release date to the Commission, which then officially sets the presumptive date at a public meeting. The investigator's recommendation isn't binding, and the Commission may consider other factors, including a non-exclusive list of aggravating and mitigating circumstances. *Id.* r. 23-21.010 (2025). One mitigator, for example, is that the "inmate committing the crime was of such a young age as to diminish his capacity to fully understand the seriousness of his action and its direct consequences." *Id.* r. 23-21.010(5)(b)1.b. At the Commission's meetings, the discussion of each inmate typically (although not uniformly) takes just a few minutes, the inmate isn't present, and there is no right to appointed counsel, to cross-examine anyone, or to rebut any statements. If the inmate has his own lawyer, the attorney may engage in advocacy before the Commission. And the inmate—and anyone else, for that matter—can make written

submissions to the Commission.  After deliberating, the Commission records its decision on a concise standardized form.

*Second*, at intervals of one to seven years between the Initial Interview and the presumptive parole release date, the Commission conducts Subsequent Interviews.  During these Subsequent Interviews, the Commission considers whether any new information should cause it to advance or delay a presumptive parole release date.  The Commission doesn't recalculate guideline presumptive parole release dates at Subsequent Interviews.  The Commission can also schedule Special Interviews if "special circumstances emerge."

*Third*, the Commission holds an Effective Interview just before the presumptive parole release date.  At that point, the Commission decides whether to actually grant parole and authorize release.

*Finally*, if the Commission doesn't authorize release at the Effective Interview, it may hold an Extraordinary Review to explain its reasoning or set a new presumptive parole release date.  At the Extraordinary Review, the Commission will again review any new information and will then decide either to keep the suspended presumptive parole release date or to set a new one.

Nothing in Florida's system requires the Commission to treat juvenile offenders serving life sentences any differently from adult offenders—with the lone exception of the youthful-offender matrix, which, again, has been used only since 2014.

## B

This lawsuit challenges the way that Florida's four-stage parole system applies to juvenile offenders. Until the 1980s, juvenile offenders in Florida could receive parole-based sentences. Those convicted of homicide offenses could be sentenced either to the death penalty or to life in prison with the possibility of parole after 25 years. *See* Fla. Stat. § 775.082(1) (1993). Later, though, Florida abolished parole—first, for non-homicide crimes in 1983, and then for homicide crimes in 1994. But because those changes were not retroactive, there are still about 170 inmates in Florida prisons who, pre-reform, were sentenced to life[3] in prison with the possibility of parole for offenses they committed as juveniles.

There used to be many more of these juvenile lifers. But in 2014, the Florida legislature, in an effort to comply with then-recent U.S. Supreme Court decisions[4] about juvenile sentencing, created new, prospectively applicable sentencing rules that were more lenient for youthful offenders. Two years later, in *Atwell v. State*, the Florida Supreme Court held that these new rules applied retroactively to the 1994-and-before juvenile lifers. 197 So. 3d 1040, 1050 (Fla. 2016). Then, though, just two years after that, the Court reversed itself and held that the 2014 juvenile-sentencing reforms did *not* apply retroactively. *See State v. Michel*, 257 So. 3d 3, 8 (Fla. 2018);

---

[3] Or a de facto term-of-years equivalent.

[4] Specifically, *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012). We discuss *Graham* and *Miller* in more detail in a moment.

*Franklin v. State*, 258 So. 3d 1239, 1241 (Fla. 2018). In the two-year *"Atwell* window," 125 juvenile lifers successfully petitioned for resentencing; of those, 98 were released, six received delayed release, three were resentenced to life, and 18 had a hearing but were not released.[5]

So again, today about 170 juvenile lifers remain incarcerated in Florida prisons. And since 2012, the Commission has released 24 of them—roughly two per year. On average, the remaining inmates are about 53 years old and have a presumptive parole release date when they are almost 93. Although Subsequent Interviews could, in theory, move the presumptive release dates up, that's somewhat unlikely. Statistically speaking, the record reveals that just 7.7% of Subsequent Interviews advance an inmate's presumptive release date. The practical upshot is that the overwhelming majority of juvenile lifers have presumptive parole release dates so far in the future that they may well die in prison.

## C

Four inmates sued Florida's parole commissioners, alleging that the state's parole system for juvenile lifers violates the United States Constitution. On behalf of a putative class of all 170-or-so juvenile lifers, the inmates asserted violations of the Sixth Amendment, the Eighth Amendment, and the Fourteenth Amendment's Due Process and Equal Protection Clauses. The Commissioners

---

[5] A number of others sought resentencing but didn't obtain a hearing before the *Atwell* window closed.

moved to dismiss, and the district court dismissed the Sixth Amendment and equal-protection claims.

The district court then certified a Rule 23(b)(2) class for the remaining Eighth Amendment and due-process claims. The class includes:

> All persons who (i) were convicted of a crime committed when they were under the age of eighteen; (ii) were sentenced to life in prison or a term of years exceeding their life expectancy (defined as greater than 470 months); (iii) are currently in the custody of the Florida Department of Corrections; (iv) have never been paroled; and (v) are or will become eligible for release to parole supervision but only through the parole process.

Following discovery and cross motions for summary judgment, the district court held that Florida's parole system violated neither the Eighth Amendment nor the Fourteenth Amendment's Due Process Clause.

This is the juvenile lifers' appeal.[6]

---

[6] We review de novo the district court's grant of summary judgment to the Commissioners and denial of summary judgment to the juvenile lifers. *Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

23-10858                Opinion of the Court                9

## II

The Eighth Amendment claim here is governed chiefly by four recent(ish) Supreme Court decisions about the constitutionality of various kinds of non-capital sentences imposed on various kinds of juvenile offenders. Unpacking those decisions' import for Florida's parole system will require a little doing, so we'll start by describing the cases. Having done so, we'll distill the governing principles and then measure the juvenile lifers' arguments against those principles.

## A

The first case in the quartet is *Graham v. Florida*, 560 U.S. 48 (2010), in which the Court addressed the Eighth Amendment's limitations on states' ability to sentence juveniles convicted of *non-homicide* offenses. Extending the rationale of its earlier decision in *Roper v. Simmons*, 543 U.S. 551 (2005), which had abolished the death penalty for juvenile offenders, *id.* at 578, the *Graham* Court held that the Eighth Amendment flatly forbids life-without-parole sentences for non-homicide juvenile offenders. 560 U.S. at 74. Importantly for our purposes, in so doing the Court said that states must provide non-homicide juvenile offenders with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

In the other three cases—*Miller v. Alabama*, 567 U.S. 460 (2012), *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and *Jones v. Mississippi*, 593 U.S. 98 (2021)—the Court addressed the Eighth

Amendment's limitations on states' ability to sentence juveniles convicted of *homicide* offenses. In *Miller*, the Supreme Court held that the Eighth Amendment forbids *mandatory* life-without-parole sentences for juvenile homicide offenders. 567 U.S. at 479. The *Miller* Court didn't categorically prohibit life-without-parole sentences for such offenders, but it did note that, "given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. Next, in *Montgomery*, the Court gave *Miller* retroactive effect but explained that a state could cure a *Miller* violation by allowing an inmate to be considered for parole. 577 U.S. at 208, 212. Finally, in *Jones*, the Court held that no specific finding of incorrigibility is necessary before sentencing a juvenile homicide offender to life without parole. 593 U.S. at 113. Significantly, in the course of its opinion, the Court explained its earlier decision in *Miller* as having held "that the . . . Eighth Amendment prohibits *mandatory* life-without-parole sentences for murderers under 18, but . . . allow[s] *discretionary* life-without-parole sentences for those offenders." *Id*. at 103 (emphasis in original).

## B

The Court's decisions make two kinds of distinctions. First, the cases distinguish between homicide and non-homicide crimes. As *Graham* puts it, "[t]here is a line between homicide and other serious violent offenses against the individual"—offenders guilty of homicide are categorically more culpable. 560 U.S. at 69 (citation

and quotation marks omitted); *accord Jones*, 593 U.S. at 106. Second, the cases distinguish between the sentences of life *with* and *without* the possibility of release. Although all four decisions dealt with life-without-parole sentences, *Graham* emphasized that, even after sentencing, the Eighth Amendment requires states to provide juvenile non-homicide offenders "some meaningful opportunity to obtain release." 560 U.S. at 75.

So, let's put these distinctions to work. *Graham* lays down the rules for non-homicide juvenile offenders. First, and most obviously, a life sentence without the possibility of release is never allowed, period. *Id*. at 74. Second, although not quite as obviously, less onerous sentences *are* allowed, and a state is "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime"—but the state must provide to such an offender, post-sentencing, "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75. We'll get to what "meaningful opportunity" means in due course.

*Miller* and *Jones* together lay down the rules for homicide offenders sentenced to life *without* the possibility of release. First, "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479 (emphasis added). Second, however, a life-without-the-possibility-of-parole sentence is permissible, provided that the sentencer has "discretion to impose a different punishment than life without parole" after "considering an offender's youth and

attendant characteristics." *Jones*, 593 U.S. at 108 (citation and quotation marks omitted); *accord Miller*, 567 U.S. at 465, 483.

None of the cases speaks directly to homicide offenders sentenced to life *with* the possibility of release. But it follows from *Miller* and *Jones* that such a sentence is allowed under the Eighth Amendment. As just explained, according to those decisions, juvenile homicide offenders can be sentenced to life *without* parole, provided that the sentence isn't mandatory and the proper process is observed. And if the stiffer sentence of life without the possibility of parole isn't a cruel and unusual punishment, then the more lenient sentence of life *with* the possibility of parole (or another sentence that similarly provides for potential future release) can't possibly be cruel and unusual. Put simply—if a little imprecisely—the greater power to impose life *without* parole includes the lesser power to impose life *with* parole.

The juvenile lifers insist that *Graham*'s "meaningful opportunity" standard—again, that states must provide juvenile non-homicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," 560 U.S. at 75—also applies to homicide offenders. It doesn't. The Supreme Court has never extended the "meaningful opportunity" rule to homicide offenders. And indeed, all indications are to the contrary. Most notably, of course, the Court in *Graham* emphasized that "[t]here is a line between homicide and other serious violent offenses against the individual." 560 U.S. at 69 (citation and quotation marks omitted). As against that clear statement, the juvenile lifers

Case 6:21-cv-00062-PGB-E_K    Document 143    Filed 04/15/25    Page 15 of 27 PageID 5559
USCA11 Case: 23-10858    Document: 45    Date Filed: 04/15/2025    Page: 13 of 25

23-10858                Opinion of the Court                13

can point only to the fact that, immediately after stating its central holding in *Miller*, the Court included the following *"cf."* citation: "Cf. *Graham*, 560 U.S. [at 75] ('A State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation')." *Miller*, 567 U.S. at 479.

That cryptic citation is entirely too thin a reed. The *"cf."* is *Miller*'s only reference to the "meaningful opportunity" standard. *Montgomery* doesn't mention it at all. And *Jones*'s description of *Miller*'s holding all but forecloses any extension of the standard to homicide offenders. As *Jones* describes things, "*Miller* held that the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits *mandatory* life-without-parole sentences for murderers under 18, but . . . allow[s] *discretionary* life-without-parole sentences for those offenders." 593 U.S. at 103. *Jones* said nothing about *non*-life-without-parole sentences, let alone anything about a "meaningful opportunity" standard applying to those sentences. We therefore hold that *Graham*'s "meaningful opportunity" rule doesn't extend to homicide offenders. In so holding, we're in good company. *See Brown v. Precythe*, 46 F.4th 879, 886 (8th Cir. 2022) (en banc) ("*Miller* and *Montgomery* did not purport to go further and direct federal courts to scrutinize in a civil rights action whether a State's parole procedures afford 'some meaningful opportunity' for release of a juvenile homicide offender."); *cf. Atkins v. Crowell*, 945 F.3d 476, 479 (6th Cir. 2019) (holding, in the habeas context, that it

14                    Opinion of the Court                    23-10858

was not clearly established that *Graham*'s "meaningful opportunity" standard extends to homicide offenders).

That said, it's not quite true, as the Commissioners seem to argue, that the rule of *Miller* completely evaporates after sentencing. A state may not evade Eighth Amendment scrutiny simply by labeling a sentence "life with parole" when, in substance, it is a life-*without*-parole sentence. In a system like Florida's, where the only sentencing options for juvenile homicide offenders were (as relevant here) the death penalty or life-with-possible-parole, some possibility of parole—however remote—must actually exist. As *Jones* explained *Miller*, a sentencer confronted with a juvenile convicted of murder must have the discretion to impose a non-life-without-parole sentence after "considering an offender's youth and attendant characteristics." *Jones*, 593 U.S. at 106, 108 (citation and quotation marks omitted). Accordingly, if a state with a Florida-like sentencing regime maintained a full-on sham parole system, it would violate *Miller* because sentencers would not, in fact, have the *Miller*-mandated discretion to impose a sentence other than life without parole.[7]

_____

[7] Our conclusion here is narrow, and is a function of the fact that Florida's only sentencing options for juvenile homicide offenders were death or life-with-possible-parole. If the options had been, say, death or 25 years, then there would have been no need to worry about whether the life-with-a-possibility-of-parole sentence was genuinely different from life *without* parole.

Summing up, the Supreme Court's quartet of juvenile-offender sentencing decisions embody four key teachings:

- *First*, homicide offenders may be sentenced to life without the possibility of parole, provided that the sentence isn't mandatory and the sentencer has the "discretion to impose a different punishment than life without parole" after "considering an offender's youth and attendant characteristics." *Jones*, 593 U.S. at 108 (citation and quotation marks omitted).

- *Second*, homicide offenders may be sentenced to less than life without parole, so long as the parole or other release system isn't a sham. *See Miller*, 567 U.S. at 465, 483.

- *Third*, non-homicide offenders may never be sentenced to life without parole. *Graham*, 560 U.S. at 75.

- *Finally*, non-homicide offenders may be sentenced to less than life without parole, so long as the state provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.*

## C

Here, the certified class contains both homicide and non-homicide juvenile offenders.[8]  So we consider how Florida's parole system stacks up against the respective standards for both.

---

[8] Two wrinkles:  First, it's at least possible that the class, in fact, doesn't contain *any* inmates convicted of non-homicide crimes.  The record doesn't reveal the divide within the class between homicide and non-homicide offenders.  At oral argument, counsel for the juvenile lifers represented that there might be just

16                    Opinion of the Court                    23-10858

---

one such offender in the class. *See* Oral Arg. at 1:35–1:43. In their briefing, the juvenile lifers asserted that one of the named plaintiffs, Willie Watts, was convicted of non-homicide offenses. *See* Br. of Appellants at 10–11 n.3. If there's just one non-homicide offender in the class, then it must be Watts. And there's the rub: The parties dispute whether Watts actually satisfies the class criteria. *Compare id.*, *with* Br. of Appellees at 17 n.2. The district court *did* conclude, in cursory fashion, that Watts wasn't a member of the class, and the Commission insinuates that we review that determination only for clear error. But the district court reached its conclusion on a motion for summary judgment, and "[b]y definition, a summary judgment ruling involves no findings of fact." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013). On our de novo summary judgment review, *Newcomb*, 926 F.3d at 713, we cannot conclude that Watts is no longer a member of the class. The Commissioners offered *no* justification for their bare assertion in the district court that Watts wasn't a class member. *See* Def.'s Resp. at 19, Doc. 112. Meanwhile, the juvenile lifers offered ample documentation of Watts's status. *See* Pls.' Am. Mot. Summ. J. at 12–14, Doc. 104. We therefore proceed on the understanding that the certified class has at least one non-homicide offender.

Second, the district court certified the class under Rule 23(b)(2). But (b)(2) classes are proper only when "relief is appropriate respecting the class as *a whole*." Fed. R. Civ. P. 23(b)(2) (emphasis added); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" (citation omitted)). Here, as already explained, the constitutional rules for homicide and non-homicide juvenile offenders are quite different. It's therefore tough to see how relief could have been appropriate for the class "as a whole." It turns out, though, that we don't need to resolve the propriety of the class certification—for reasons we'll explain, the disposition is the same for both homicide and non-homicide offenders.

**1**

First, and very briefly, the homicide offenders:  As we've explained, to comply with *Miller*, Florida's parole system can't be a sham.  And it isn't.  Since 2012, the Commission has granted parole to at least 24 juvenile lifers who would otherwise be part of the certified class—on average, about two every year.  Given that about 170 juvenile lifers remain incarcerated, the math works out to about 1% of the juvenile-lifer population obtaining release yearly.  Florida's system may not be a particularly generous one, but it's hardly a sham.  The upshot:  When the juvenile lifers were convicted, decades ago, their sentencers genuinely had the discretion to choose a sentence of less than life in prison, as required by *Miller*.  *See* 567 U.S. at 465, 483.  So, with respect to the homicide offenders, the Eighth Amendment claim fails.

**2**

Next, and necessarily at some greater length, the non-homicide offenders:  To comply with *Graham*, a state must provide to non-homicide offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  560 U.S. at 75.  We conclude that Florida's system satisfies this requirement.

The Supreme Court has never been entirely clear about what counts as a constitutionally valid "meaningful opportunity."  *Graham*, 560 U.S. at 75; *see United States v. Grant*, 9 F.4th 186, 212 (3d Cir. 2021) (en banc) (Greenaway, J., concurring) (pointing out that "the Supreme Court has never outlined a test for distinguishing a

realistic opportunity from a remote one"). But we can infer some
basic characteristics. First, the decisionmakers in the state's release
system must have the ability to incorporate "demonstrated ma-
turity and rehabilitation" into their assessment of whether to re-
lease a juvenile non-homicide offender. *Graham*, 560 U.S. at 75 (ex-
plaining that states "must" provide for non-homicide juvenile of-
fenders a chance for release "*based on* demonstrated maturity and
rehabilitation" (emphasis added)). Second, the decisionmakers
must actually exercise that authority. After all, the "opportunity"
for release "based on" maturity and rehabilitation isn't very "mean-
ingful" if, in fact, the relevant decisionmakers just ignore those cri-
teria. And third, a juvenile non-homicide offender must have some
mechanism for making his views known—for pointing out (or, as
*Graham* phrases it, "demonstrat[ing]") to the decisionmakers his
maturity and rehabilitation. *Id.*[9]

---

[9] The Fourth and Eighth Circuits—albeit without articulating a specific test—
have in practice taken a similar approach in concluding that states are provid-
ing inmates with a "meaningful opportunity." Most recently, the Eighth Cir-
cuit emphasized (1) that parole-board members could consider factors like
"the defendant's culpability in light of his age" and "the person's institutional
record during incarceration," (2) that inmates had an opportunity to be heard,
and (3) that board members did, in fact, take youth, rehabilitation, and ma-
turity into account in their decisions. *See Brown*, 46 F.4th at 886–89. In similar
fashion, the Fourth Circuit had earlier highlighted that Virginia's parole-board
members could (1) "fully consider the inmate's age at the time of the offense,"
(2) assess "any evidence submitted to demonstrate his maturation since then,"
and (3) "account for the concern at the heart of *Graham* and *Miller*: 'that chil-
dren who commit even heinous crimes are capable of change.'" *Bowling v.*

Beyond this, we hesitate to say more. According to *Graham*, "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" with the meaningful-opportunity mandate. 560 U.S. at 75. It's not our place to prescribe specific procedures or decree particular outcomes. So, for example, we would not and do not suggest that a state can provide a "meaningful opportunity" only if it achieves some minimum release rate. After all, a state might just have a number of juvenile offenders who are resistant to reform. *Cf. id.* ("Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives.").

With that rough sketch of the meaningful-opportunity standard, we turn to Florida's parole system, and we conclude that it checks all the boxes. First, the parole-system regulations make clear that the Commissioners have the authority to consider maturity and rehabilitation. When the Commissioners formally set the presumptive release date, they may consider whether the inmate "was of such a young age as to diminish his capacity to fully understand the seriousness of his action and its direct consequences," "has made restitution to the victim of this crime for the injury, damage, or loss sustained," or "has made a record of clearly exceptional program achievement." Fla. Admin. Code Ann. r. 23-21.010(5)(b)1.b., 2.e., 2.j. And these factors are non-exclusive; the

---

*Dir., Va. Dep't of Corr.*, 920 F.3d 192, 198–99 (4th Cir. 2019) (citation and quotation marks omitted).

20                    Opinion of the Court                    23-10858

Commissioners "may render a decision . . . based on any compe-
tent and persuasive evidence relevant to aggravating or mitigating
circumstances." *Id.* r. 23-21.010(1); *see id.* r. 23-21.010(5) (providing
that "the Commission is not limited to" the enumerated aggravat-
ing and mitigating factors).[10]

_____

[10] Our conclusion doesn't depend on the changes the Commission made in
2014 to its process for setting presumptive parole release dates. Today, when
investigators set an initial guideline presumptive release date, they use a
youthful-offender matrix, which produces substantially more lenient guideline
release dates for juvenile offenders. *Compare* Fla. Admin. Code Ann. r. 23-
21.009(5) (adult matrix), *with id.* r. 23-21.009(6) (youth matrix). But before
2014, the Commission used the same matrix for both adult and juvenile of-
fenders, and then-existing regulations actually provided for a *higher* salient-fac-
tor score for juvenile offenders. *See* Fla. Admin. Code Ann. r. 23-21.007(4)(a)
(2013).

    The applications of the youthful-offender matrix and the pre-2014 ju-
venile-offender penalty are individual—not a class-wide—issues. As the dis-
trict court noted, class members who had their Initial Interview before the
2014 reforms might have stronger individual arguments. *See* Order at 21 n.12,
Doc. 136. We express no view about that (or any other) individualized issue—
this is a class-action lawsuit, and we must reach our determinations on a class-
wide basis. Indeed, it's not even clear from the record whether *any* non-hom-
icide juvenile offenders had their Initial Interview without the benefit of the
youthful-offender matrix. An expert report estimated that 55.7% of class
members—homicide and non-homicide offenders—had their Initial Inter-
views without the benefit of the youthful-offender matrix. But as we ex-
plained above, the meaningful-opportunity standard applies only to *non*-hom-
icide offenders—and we don't know how many non-homicide offenders are
in the class. So far as we can tell, there's just one: Willie Watts. *See supra* note
8. And it seems like Watts must have had his Initial Interview before 2014
because the record includes the notes from a *Subsequent* Interview held in 2005.
*See* Pls.' Am. Mot. Ex. 20 at 1, Doc. 104-20. Even so, the Commission's

Second, the record indicates that the Commissioners do in fact exercise their authority. In their joint statement of material facts, the parties agreed that the Commissioners have "testified that they consider factors relating to youth when setting or modifying" the presumptive parole release date. For example, then-Chairperson Melinda Coonrod reported in her deposition that she "consider[s] age throughout the entire review of the record" and that "[e]very time [she] score[s] the case the age is always considered."

Third, inmates can make their case—*i.e.*, can attempt to demonstrate their maturity and rehabilitation. As part of the Initial Interview process, an investigator meets with the inmate and discusses the recommendation the investigator plans to make to the Commission. An inmate is permitted to retain counsel and experts to assist him in the parole process. When an inmate is up for consideration, counsel may speak to the Commission at its public meeting. Whether or not a lawyer is involved, inmates (and anyone else) can provide written submissions to the Commission at any time. And if circumstances change, presumptive parole release dates may be adjusted at the regular Subsequent Interviews.

Even if only infrequently, the Commission does sometimes authorize release. Under *Graham*, the Eighth Amendment

---

treatment of Watts, in particular, is hardly conduct "that appl[ies] generally to the class." Fed. R. Civ. P. 23(b)(2). Moreover, for all we know, there are other non-homicide offenders in the class who may (or may not) have had their Initial Interviews before 2014. We therefore can't resolve those peculiar issues—to the extent they exist—in this case.

demands a *meaningful opportunity* for release—not a *likelihood* of release. Given these particular circumstances, and on this record, we hold that the Commission provides to non-homicide juvenile offenders a constitutionally adequate "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

\*   \*   \*

Florida's parole system holds up under Eighth Amendment scrutiny. For homicide offenders, it's not a sham—satisfying *Miller*. And for non-homicide offenders, it offers a meaningful opportunity for release—satisfying *Graham*.

## III

We turn, then, to the Due Process Clause. A plaintiff raising a procedural-due-process claim must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1035 (11th Cir. 2022) (citation and quotation marks omitted). Here, we resolve the appeal at step one by concluding that the juvenile lifers haven't pointed to a constitutionally protected interest for which process is due.

Sometimes, a protectable liberty interest "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). And sometimes, state law may give rise to a protectable liberty interest in the workings of a parole system. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442

U.S. 1, 12 (1979); *cf. Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 931 (11th Cir. 1986). But not here. "Such an interest arises only when a parole statute provides that specific conditions mandate release." *Damiano*, 785 F.2d at 932. And in Florida, "the ultimate parole decision is a matter of . . . discretion." *Id.* Therefore, we have repeatedly held that "Florida has not created a liberty interest in the outcome of [its parole] decision[s]." *Id.*; *accord Staton v. Wainwright*, 665 F.2d 686, 688 (5th Cir. Unit B 1982); *Hunter v. Fla. Parole & Prob. Comm'n*, 674 F.2d 847, 848 (11th Cir. 1982). The Commissioners explain at length why state law doesn't provide the juvenile lifers with a protectable interest, and they're right. Although Florida's parole system has evolved over the years, it remains the case that the ultimate release decision is a discretionary one. *Compare* Fla. Stat. § 947.002(5) ("It is the intent of the Legislature that the decision to parole an inmate from the incarceration portion of the inmate's sentence is an act of grace of the state and shall not be considered a right."), *with id.* § 947.002(6) (1985) (similar).

Presumably recognizing as much, the juvenile lifers don't seem to wager much on the state-law theory. Instead, they appear principally to argue that the Eighth Amendment *itself* has given rise to some kind of constitutionally protected liberty interest. *See Wilkinson*, 545 U.S. at 221 (explaining that "[a] liberty interest may arise from the Constitution itself"). They're not always clear about what that interest *is*—sometimes they describe it as an interest in "not dying in prison," and sometimes as a "meaningful opportunity for release." Neither contention, we conclude, holds water.

24                    Opinion of the Court                    23-10858

The Eighth Amendment clearly doesn't create a due-process-protected interest in "not dying in prison."  After all, *Graham* itself said that the "Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life."  560 U.S. at 75.

Nor is there a cognizable liberty interest in a "meaningful opportunity for release."  First, the Supreme Court has held categorically that "[t]here is *no* constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."  *Greenholtz*, 442 U.S. at 7 (emphasis added).  The juvenile lifers don't explain how *Graham*, *Miller*, *Montgomery*, or *Jones* could have created (sub silentio) an exception to that rule.  Second, even on its own terms, *Graham* never described the meaningful-opportunity standard as establishing or embodying a liberty interest.  *See* 560 U.S. at 75.  Whether to release an inmate, the Court stressed, remains in the hands of the state, which is "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime."  *Id*.  The meaningful-opportunity rule is more accurately understood as a procedural obligation.  So, at bottom, the juvenile lifers seem to be asserting that the Commissioners deprived them of a process without sufficient process.  But when they assail the various ways in which the Commission's process purportedly falls short, the faults they describe all pertain to the state's process for granting *release itself*, not the process for determining whether to grant an *opportunity for release*.  *See* Br. of Appellants at 46–51.  That disconnect is revealing.

Accordingly, we hold that the juvenile lifers do not have a constitutionally cognizable liberty interest under either state law or the Eighth Amendment and that their procedural-due-process claim therefore fails.[11]

## IV

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the Commissioners.

---

[11] Because we resolve the due-process claim on this ground, we express no view on whether *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), or *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011), supplies the proper standard for evaluating due-process claims about state parole systems.